The PEOPLE of the State of Colorado,
Plaintiff-Appellee,

v.

Bernard C. CASTRO, Sr.,
Defendant-Appellant.

No. 81SA103.

Supreme Court of Colorado,
En Banc.

Jan. 24, 1983.
Rehearing Denied Feb. 14, 1983.

J.D. MacFarlane, Atty. Gen., Richard F. Hennessey, Deputy Atty. Gen., Mary J. Mullarkey, Sol. Gen., Clement P. Engle, Asst. Atty. Gen., Denver, for plaintiff-appellee.

J. Gregory Walta, Colorado State Public Defender, Harvey M. Palefsky, Deputy State Public Defender, Denver, for defendant-appellant.

QUINN, Justice.

The defendant, Bernard C. Castro, Sr., appeals his conviction of criminal attempt to commit extreme indifference murder. Sections 18–2–101 and 18–3–102(1)(d), C.R.S.1973.[1] He questions whether attempted extreme indifference murder is a cognizable crime under the Colorado Criminal Code and alternatively challenges the statutory

---

1. The extreme indifference murder statute was amended effective July 1, 1977. Colo. Sess. Laws 1977, ch. 224, 18–3–102(1)(d) at 960. The amendment changed the culpability element from "intentionally" to "knowingly." We dealt with this amended culpability element in *People v. Marcy,* 628 P.2d 69 (Colo.1981). We there held that the culpability element for extreme indifference murder was not sufficiently distinguishable from the culpability element for second degree murder to warrant the substantial differential in penalty authorized for ex-

treme indifference murder. Since the offense in this case occurred on May 31, 1977, we deal only with the version of the statute which antedated the 1977 amendment. Unless otherwise indicated, our resolution of the defendant's arguments relating to the crime of attempted extreme indifference murder is based on the statutory provisions formerly found in Volume 8 of the 1973 Colorado Revised Statutes, which has since been replaced by the 1978 Replacement Volume 8.

definition of this offense as unconstitutionally vague and violative of equal protection of the laws. He also claims that the evidence was legally insufficient to support his conviction. In addition, the defendant asserts that the constitutional prohibition against double jeopardy was violated when he was subjected to a retrial after a mistrial declaration due to the victim's sudden illness and consequent unavailability to testify as a prosecutorial witness. Finally the defendant contends that a conflict of interest on the part of his trial counsel deprived him of his constitutional right to effective assistance of counsel. We conclude that the defendant was denied effective assistance of counsel during the trial of this case and, while we reject his other claims, we reverse his conviction and remand for a new trial.

## I.

The defendant was charged in the Pueblo District Court with attempted extreme indifference murder. The charging document was filed by J.E. Losavio, Jr., the District Attorney for the Tenth Judicial District, but all court proceedings were handled by his assistants or deputies. The charge arose out of the shooting of Alfred Mares on May 31, 1977, in the parking lot of the Heritage House, a bar in Pueblo. On July 13, 1977, the county court appointed an attorney in private practice to represent the defendant due to his financial inability to retain his own attorney. The case ultimately was bound over to the district court for trial.

On October 31, 1978, trial was commenced and a jury was selected and sworn on that day.[2] On the following morning, Wednesday, before opening statements, the prosecutor advised the court that he was unable to proceed because Alfred Mares, the victim, had been admitted to the hospital the previous evening with an acute urinary tract infection and was not available to testify in the case. The treating physician, according to the prosecutor, was unable to determine how long Mr. Mares would be hospitalized but was certain that he would remain in the hospital through Friday of that week. The prosecutor also advised the court that while Mares might be able to testify in a few days, the treating physician cautioned that he would be under sedation during his testimony and his testimony could not exceed two hours. Defense counsel urged the court to proceed with the trial, arguing that the prosecution had other witnesses to support its case. The court ruled that Mr. Mares was an essential witness to the prosecution's case and, due to his unavailability, declared a mistrial.

Trial commenced again on January 16, 1979, and resulted in a guilty verdict. The evidence at this last trial centered on the shooting incident of May 31, 1977. During the afternoon of that day Alfred Mares went to the Heritage House Bar for a beer with his uncle, Clovis Velasquez. While inside the bar he spoke to another uncle, John Velasquez, and John's wife. During this conversation a man whom he knew at the time as "Barney," later identified as the defendant, approached him with a young boy at his side and engaged him briefly in conversation. Later an argument developed between the defendant and one Dennis Gonzales over a pool game. The argument became heated and the two men left the bar in an agitated state.

Eventually Mares left the bar and walked to a parking lot where he had previously parked his car. Without warning or apparent reason the defendant, whom Mares had observed just moments before speaking outside the bar with Dennis Gonzales, walked over to his truck and pulled out a shotgun. He aimed the weapon at Mares and started yelling at him. John Velasquez, who had left the bar, stepped between the defendant and Mares and told the defendant to put down the weapon. The defendant lowered the shotgun and walked back towards his truck. Shortly thereafter he fired a shot in the general direction of the bar where several people were still inside. When Mares

2. The defendant had been tried on two previous occasions, but both trials resulted in a deadlocked jury and a mistrial. These events do not form the basis of any issue raised in this appeal.

turned around to see where the shot impacted, the defendant again fired the weapon and shot Mares in the abdomen. Clovis Velasquez wrestled the defendant for the gun but the defendant succeeded in grabbing it away. He reloaded and took aim at Clovis. At this point John Velasquez intervened and told the defendant not to shoot. The defendant's son said "Let's go dad," whereupon the defendant drove away.

Alfred Mares sustained serious injuries to the upper left quadrant of his abdomen, including damage to his kidney, spleen, pancreas, and small intestines. None of the prosecution witnesses was able to offer any reason for the defendant's conduct.

The defendant testified in his own behalf and offered the following version of the shooting. When he left the bar to fight Dennis Gonzales, several other persons followed. Gonzales pulled out a knife and asked the defendant to proceed to an area to the rear of a nearby liquor store. As the defendant moved slowly towards the liquor store, he observed his son being dragged by Alfred Mares and Clovis Velasquez, at which point he ran for his shotgun. After he fired a warning shot in the air, his son was released and ran to the passenger side of his vehicle. Mares, Clovis Velasquez and others approached the vehicle and, according to the defendant, someone jumped him from behind and grabbed him by the throat. In the ensuing struggle the shotgun discharged and struck Mares.

After the verdict was returned the defendant's attorney filed a motion for a new trial, based primarily on the alleged insufficiency of the evidence to sustain the jury verdict. While this motion was pending the defendant filed a *pro se* petition for an order requiring defense counsel to withdraw and a *pro se* motion for a new trial. The defendant's petition and motion were based upon a claim of ineffective assistance of counsel during the trial because, as asserted by the defendant, his defense counsel

during the very same period in which this case was being prosecuted also represented Joseph E. Losavio, Jr., the District Attorney for the Tenth Judicial District. The trial court denied all motions without a hearing and thereafter on April 10, 1979, sentenced the defendant to a term of twelve to eighteen years for attempted extreme indifference murder.

After the filing of a notice of appeal the trial court appointed the Public Defender's Office on May 4, 1979, to represent the defendant on his appeal. While the appeal was still pending the court of appeals remanded the case to the trial court to allow the defendant to pursue his claim of ineffective assistance of counsel. The public defender filed a motion to vacate the defendant's conviction and sentence under Crim.P. 35(c) on the basis of ineffective assistance of counsel stemming from defense counsel's simultaneous representation of the defendant and District Attorney Losavio.

A hearing was held on the postconviction motion on September 26, 1980. The evidence established that during the period of defense counsel's representation of the defendant, from approximately July 8, 1977, through May 4, 1979, she also was serving as attorney for District Attorney Losavio in two legal matters.[3] One matter related to an electors' petition in 1977 for the recall of Mr. Losavio as district attorney. Mr. Losavio contested the recall petition by filing protests with the Secretary of State, and extensive litigation ensued. The other matter involved a 1977 indictment returned against Mr. Losavio for overspending his budget and was several years in litigation, finally terminating in an appeal to this court in which defense counsel successfully appeared on behalf of Mr. Losavio.[4] Defense counsel, during her representation of the defendant, at no time advised the court of any conflict of interest. She testified,

---

**3.** Defense counsel testified that she was retained by Mr. Losavio in these matters and received a fee which considerably exceeded any fee paid by the state for her services on behalf of the defendant.

**4.** *See People v. Losavio, Jr.,* 199 Colo. 212, 606 P.2d 856 (1980).

however, that she did inform the defendant of her simultaneous representation of the district attorney on the recall petition and that the defendant stated to her that it made no difference to him. She also testified to having cautioned the defendant against expecting any favors from her representation of the district attorney.[5] The defendant denied receiving such information from defense counsel and claimed that he did not learn of the joint representation until the conclusion of the last trial. The trial court denied the defendant's claim of ineffective assistance of counsel, finding that "the allegations of the Defendant are without merit and do not warrant post-conviction relief." The case thereafter was certified to the court of appeals and ultimately was referred to this court due to the constitutional claims raised by the defendant.[6]

We will first consider the defendant's claim that attempted extreme indifference murder is not a cognizable crime, next his due process and equal protection challenges to the statutory definition of this offense, and then the sufficiency of evidence to support his conviction. We will then address his contention that the constitutional prohibition against double jeopardy prevented his last retrial due to the absence of manifest necessity for the mistrial declaration. Last, we will consider his claim of ineffective assistance of counsel.

## II.

■ The defendant advances the following argument in support of the proposition that attempted extreme indifference mur-

der is not a cognizable crime under the Colorado Criminal Code: a criminal attempt requires an intent to complete the underlying offense; the element of "intentionally engaging in conduct creating a grave risk of death," as required for the underlying offense of extreme indifference murder, entails an unintentional and inchoate act; therefore, the defendant concludes, an attempt to commit extreme indifference murder requires an intent to commit an unintentional and inchoate act, a logical and legal impossibility. We find this argument to be constructed on a faulty premise, namely, that the crime of extreme indifference murder entails an unintentional and inchoate act.

On May 31, 1977, the date of the offense in question, the crime of criminal attempt was defined as follows:

"A person commits criminal attempt if, acting with the kind of culpability otherwise required for commission of an offense, he intentionally engages in conduct constituting a substantial step toward the commission of the offense." Section 18–2–101(1), C.R.S.1973.

A substantial step was defined as any conduct "which is strongly corroborative of the firmness of the actor's intent to complete the commission of the offense." The crime of extreme indifference murder, on May 31, 1977, required the following elements: (1) under circumstances manifesting extreme indifference to the value of human life; (2) "intentionally" engaging in conduct that creates a grave risk of death to another; and (3) thereby causing the death of another. Section 18–3–102(1)(d), C.R.S.1973.

---

**5.** Defense counsel testified that she first met the defendant in the county jail prior to the preliminary hearing and advised him of her representation of Mr. Losavio. She further stated that she told the defendant: "Don't expect that you will get any favored treatment from Mr. Losavio because I am representing you. I know this man very well, and he will have nothing to do with this case. He will turn it over to a deputy and he'll divorce himself from it. That's the way he performs. And you'll get no favors because I'm representing you and I'm representing him. So don't think you will." This admonition, so far as the rec-

ord reflects, constitutes the extent of defense counsel's discussion with the defendant about any conflict of interest.

Defense counsel testified that she believed the appointing county judge and the trial judge were aware of her representation of District Attorney Losavio because it was well publicized in the Pueblo papers. She also stated that she informally requested leave to withdraw after the second mistrial due to feeling "burned out," but the request was denied.

**6.** See section 13–4–102(1)(b) and 13–4–110(1)(a), C.R.S.1973.

The culpability element of acting "intentionally" was defined to include not only a conscious object to cause a particular result but also, as important here, a conscious object to engage in particular conduct. Section 18–1–501(5), C.R.S.1973.

Extreme indifference murder, admittedly not a specific intent offense, is a crime requiring a conscious object to engage in conduct creating a grave risk of death to another. We recognized as much in *People ex rel. Russel v. District Court,* 185 Colo. 78, 83, 521 P.2d 1254, 1256 (1974), where we stated:

"[T]hough the statute requires that the conduct which creates a grave risk of death be intentional, the use of 'intentionally' here does not necessarily mean that the intent be to take the life of a particular person. Indeed, if such were the case, there would be but little difference between this statute and the other sections of the first-degree murder statute, *see* 1971 Perm.Supp., C.R.S.1963, 40–3–102(1)(a). Furthermore, our statutes define 'intentionally' as 'when his conscious object is to cause that result or to engage in that conduct,' 1971 Perm.Supp., C.R.S.1963, 40–1–601(6), which we read to mean that the conduct creating the grave risk of death be consciously done."

In *People v. Marcy,* 628 P.2d 69 (Colo.1981), we elaborated further on the culpability requirement of extreme indifference murder, as that crime was originally defined in the Colorado Criminal Code and is applicable here. We pointed out that "[u]nder the initial statutory scheme the *mens rea* for extreme indifference murder—intentionally engaging in conduct which creates a grave risk of death—was not bottomed in the result of the act but in the conduct." *Id.* at 77. The crime of extreme indifference murder, in other words, while not requiring a conscious object to kill, necessitates a conscious object to engage in conduct that creates a grave risk of death to another. *Id.* In this sense the culpability element of extreme indifference murder is akin to what traditionally has been known as "general intent." *See* section 18–1–501(6), C.R.S.1973 (1978 Repl.Vol. 8).

It is quite obvious that the statutory ingredients of attempted extreme indifference murder do not postulate a logical or legal inconsistency by requiring an intent to engage in an unintentional act. The crime of extreme indifference murder requires an intentional state of mind with respect to proscribed conduct. The actor must be aware of his conduct and have a conscious object to engage in it. This form of consciously directed action is the antithesis of the unintentional conduct which the defendant erroneously ascribes to the crime of extreme indifference murder. Because the underlying offense of extreme indifference murder entails intentional rather than unintentional conduct, the defendant's assertion that the crime of attempted extreme indifference murder requires an intent to commit an unintentional act is without legal foundation.

We also reject the defendant's argument that because the death-causing conduct necessary to the completed offense need only create a grave risk of death (a mere possibility, in the defendant's view, that death will occur), the crime of attempted extreme indifference murder is in effect an attempt to commit an inchoate crime. Extreme indifference murder forbids not what might be characterized as inchoate conduct but, rather, conduct that does in fact result in death. The crime of attempted extreme indifference murder requires quite clearly that the actor's conduct constitute a substantial step towards the completed offense which, by definition, includes the causing of another's death. *See, e.g., People v. Marcy, supra; People ex rel. Russel v. District Court, supra.* Thus, contrary to the defendant's claim, there is neither legal nor logical inconsistency in the statutory proscription of attempted extreme indifference murder.

### III.

The defendant contends that the statutory definition of attempted extreme indifference murder is void for vagueness because the statutory terms "extreme indif-

ference" and "grave risk of death," both of which are essential elements of the crime, are not readily understandable by persons of ordinary intelligence. We find no merit in this argument.

■ The Due Process Clauses of the United States and Colorado Constitutions, *U.S. Const.* Amend. XIV; *Colo. Const.* Art. II, Sec. 25, require that criminal laws be sufficiently specific to give fair warning of the proscribed conduct to persons of ordinary intelligence, *e.g., Connally v. General Construction Co.,* 269 U.S. 385, 46 S.Ct. 126, 70 L.Ed. 322 (1926); *People ex rel. City of Arvada v. Nissen,* 650 P.2d 547 (Colo.1982); *People v. Blue,* 190 Colo. 95, 544 P.2d 385 (1975); *People ex rel. Russel v. District Court, supra.* This is not to say, however, that due process of law requires mathematical exactitude in legislative draftsmanship. We have recognized that while the statute must be sufficiently specific to give fair warning of the proscribed conduct, it also must remain "sufficiently general to address the essential problem under varied circumstances and during changing times." *Colorado Auto and Truck Wreckers v. Department of Revenue,* 618 P.2d 646, 651 (Colo.1980). Nor is it constitutionally required that a criminal statute define every word or phrase that constitutes an element of an offense. *People ex rel. City of Arvada v. Nissen, supra; People v. Blue, supra.* Due process of law is satisfied as long as the statutory terms "are sufficiently clear to persons of ordinary intelligence to afford a practical guide for law-abiding behavior

and are capable of application in an even-handed manner by those responsible for enforcing the law." *People ex rel. City of Arvada v. Nissen,* 650 P.2d at 551; *see also, e.g., People v. McKnight,* 626 P.2d 678 (Colo.1981); *People v. Latsis,* 195 Colo. 411, 578 P.2d 1055 (1978); *People v. Albo,* 195 Colo. 102, 575 P.2d 427 (1978); *People v. Blue, supra.*

In *People ex rel. Russel v. District Court, supra,* we upheld against a void for vagueness challenge the extreme indifference murder statute involved in this case. We found the culpability element of this offense sufficiently distinguishable from the *mens rea* of second degree murder and reckless manslaughter because, as we there observed, the statutory requirement that "the defendant intentionally engage in conduct which creates a grave risk of death to a person other than himself" meant only that "the conduct creating the grave risk of death be consciously done." 185 Colo. at 83, 521 P.2d at 1256.[7]

Indeed, *People v. Marcy, supra,* dispels any lingering doubts about the meaning of the terms "extreme indifference" and "grave risk of death" in the context of extreme indifference murder. We there stated that the term "under circumstances manifesting extreme indifference to the value of human life" connotes "a heightened awareness and disregard of a fatal risk" and is descriptive of a level of conduct which traditionally has been characterized as a wilful disregard of consequences. 628

7. In *People v. Jones,* 193 Colo. 250, 565 P.2d 1333 (1977), *appeal dismissed,* 434 U.S. 962, 98 S.Ct. 498, 54 L.Ed.2d 447 (1977), we extended the scope of extreme indifference murder to a situation where the defendant caused the death of his female acquaintance by stabbing her. The defendant contends here that the application of the extreme indifference murder statute to the facts of *Jones* adds increased vitality to the void for vagueness argument because, in the defendant's view, the *Jones* decision renders extreme indifference murder virtually indistinguishable from other forms of criminal homicide. Our recent holding in *People v. Marcy,* 628 P.2d 69 (Colo.1981), disposes of this aspect of the defendant's argument. We there stated:

"Although the application of the statute to the disputed facts [in *Jones*] constituted a significant departure from the narrow construction of *People ex rel. Russel v. District Court* ... *Jones* did acknowledge that the requisite culpability for extreme indifference murder was substantively distinct from the culpability requirements for other criminal homicides."

\* \* \* \* \* \*

"Thus, while *Jones* construed the statutory definition of extreme indifference murder to include conduct that created a grave risk of death 'to a single person,' the statutory culpability for the crime remained nevertheless categorically distinct from the culpable mental states for other criminal homicides." 628 P.2d at 77.

P.2d at 79. The term "grave risk of death" is also not without objective content. As noted in *Marcy,* the term " '[g]rave' is commonly understood to mean serious or imminent, or likely to produce great harm or danger." *Id.* The term "grave risk of death," as used in the extreme indifference murder statute, refers to conduct that is practically certain to cause the death of another. *Id.* We therefore conclude that the terms "extreme indifference" and "grave risk of death," when viewed in the context of the 1971 version of the extreme indifference murder statute, are not so obscure or lacking in meaning as to render the statutory proscription void for vagueness.

## IV.

The defendant argues that his conviction for attempted extreme indifference murder violates equal protection of the laws because on the date of the offense, May 31, 1977, the crime of attempted extreme indifference murder was indistinguishable from assault in the first degree; and, notwithstanding the lack of any intelligible basis for distinction, the crime of attempted extreme indifference murder was a class 2 felony punishable by a ten to fifty year term of imprisonment, while assault in the first degree was only a class 3 felony punishable by a five to forty year term of imprisonment. *See* section 18–1–105(1), C.R.S.1973. We disagree with the defendant's contention.

Equal protection of the laws, as guaranteed by Article II, Section 25 of the Colorado Constitution, is violated "if different statutes proscribe the same criminal conduct with disparate criminal sanctions" and, similarly, if "separate statutes [proscribe] with different penalties what ostensibly might be different acts, but [offer] no intelligible standard for distinguishing the proscribed conduct . . . ." *People v. Marcy,* 628 P.2d at 74–75; *see also, e.g., People v. Bramlett,* 194 Colo. 205, 573 P.2d 94 (1977), *cert. denied,* 435 U.S. 956, 98 S.Ct. 1590, 55 L.Ed.2d 808 (1978); *People v. Dominguez,* 193 Colo. 468, 568 P.2d 54 (1977); *People v. Calvaresi,* 188 Colo. 277, 534 P.2d 316 (1975).

A review of the statutory definitions of attempted extreme indifference murder and of assault in the first degree satisfies us that there is a sufficient difference in the conduct proscribed by these offenses to justify the resulting differential in penalty.

On May 31, 1977, the crime of assault in the first degree required the following elements: (1) under circumstances manifesting extreme indifference to the value of human life; (2) engaging in conduct that creates a grave risk of death to another person; and (3) thereby causing serious bodily injury to any person. Section 18–3–202(1)(c), C.R.S.1973. "Serious bodily injury" was defined as "bodily injury which involves a substantial risk of death, serious permanent disfigurement, or protracted loss or impairment of the function of any part or organ of the body." Section 18–1–901(3)(p), C.R.S.1973. Although no culpable mental state was included within the statutory definition of assault in the first degree, it is quite apparent that this offense was not intended as a crime of strict liability. Some culpable mental state therefore was necessarily involved in the proscribed conduct. Section 18–1–504(2), C.R.S.1973. We believe the appropriate mental state implied but not expressly included in the crime of assault in the first degree is the culpable mental state of "knowingly." *See, e.g., People v. Bridges,* Colo., 620 P.2d 1 (Colo. 1980) (mental state of "knowingly" implied for crime of engaging in a riot); *People v. Naranjo,* 200 Colo. 1, 612 P.2d 1099 (1980) (*mens rea* of "knowingly" implied for crime of first degree sexual assault). This construction is consistent with the subsequent amendment to the statute proscribing assault in the first degree, effective July 1, 1977, which expressly included the culpable mental state of "knowingly" for that offense. Section 18–3–202(1)(c), C.R.S.1973 (1978 Repl.Vol. 8).

On the date of the offense section 18–1–501(6), C.R.S.1973, provided that a person acts "knowingly" with respect to conduct when he is aware that his conduct is of that nature. While arguably the "general intent" required for extreme indiffer-

ence murder is the substantial equivalent of the "knowing" conduct essential to assault in the first degree, see People v. Marcy, 628 P.2d at 77–80, the crime of attempted extreme indifference murder requires an added and critical element: the actor's conduct must constitute a substantial step towards the completion of an extreme indifference murder which, by definition, necessarily includes the causation of another's death. Thus, attempted extreme indifference murder requires conduct which poses a real and proximate risk of death to the victim. The crime of assault in the first degree, in contrast, does not require that the actor's conduct constitute a substantial step towards the causation of another's death. Serious bodily injury, by statute, includes those injuries which involve serious permanent or protracted loss or impairment of the function of any part or organ of the body, even though in these instances there may be no risk of death resulting from the injuries. Section 18–1–901(3)(p), C.R.S.1973; see People v. Sheldon, 198 Colo. 519, 602 P.2d 869 (1979). The heightened risk of death to the victim constitutes, in our view, the gravamen of attempted extreme indifference murder and distinguishes this offense from assault in the first degree. We do not find this difference between attempted extreme indifference murder and assault in the first degree so lacking in objective content as to render the penalty differential for these offenses violative of equal protection of the laws.

## V.

The defendant next asserts that the evidence was insufficient as a matter of law to support a finding beyond a reasonable doubt that he satisfied the requisite culpability for attempted extreme indifference murder. We disagree.

█ The evidence, when viewed in a light most favorable to the prosecution with all reasonable inferences being drawn in its favor, is sufficient to support a conclusion by a reasonable person beyond a reasonable doubt that the defendant, at the time of the shooting, was consciously aware that his conduct manifested extreme indifference towards the lives of the victim, Alfred Mares, and of those in the immediate vicinity of the shooting. Furthermore, the defendant's total conduct during this episode, which involved separate shotgun blasts fired in the general direction of the victim and other persons, manifests consciously performed conduct that creates a grave risk of death to another. See People ex rel. Russel v. District Court, 185 Colo. at 83, 521 P.2d at 1256. Finally, there is a substantial basis in the record for the inference that the defendant's conduct constituted a substantial step towards the crime of extreme indifference murder, and this substantial step, consciously undertaken by the defendant, would indeed have resulted in the completed offense of extreme indifference murder had the victim not remarkably survived. In sum, the evidence in this case is legally sufficient to support the jury verdict.

## VI.

The defendant's next claim centers on the constitutional prohibition against twice placing an accused in jeopardy for the same offense. U.S. Const. Amends. V and XIV; Colo. Const. Art. II, Sec. 18. He argues that there was no manifest necessity for a mistrial based upon the sudden hospitalization of the victim, Alfred Mares. We are unpersuaded by his argument.

The constitutional standard for determining whether the Double Jeopardy Clause prohibits a retrial of an accused following the declaration of a mistrial over the defendant's objection was first articulated by the United States Supreme Court in United States v. Perez, 9 Wheat. (22 U.S.) 579, 6 L.Ed. 165 (1824):

"We think, that in all cases of this nature, the law has invested courts of justice with the authority to discharge a jury from giving any verdict, whenever, in their opinion, taking all the circumstances into consideration, there is a manifest necessity for the act, or the ends of public justice would otherwise be defeated. They are to exercise a sound discretion on the subject; and it is impossible to define

all the circumstances which would render it proper to interfere."

This standard has been consistently followed over the years. *E.g., Arizona v. Washington,* 434 U.S. 497, 98 S.Ct. 824, 54 L.Ed.2d 717 (1978); *Illinois v. Somerville,* 410 U.S. 458, 93 S.Ct. 1066, 35 L.Ed.2d 425 (1973); *Ortiz v. District Court,* 626 P.2d 642 (Colo.1981); *Maes v. District Court,* 180 Colo. 169, 503 P.2d 621 (1972); *Falgout v. People,* 170 Colo. 32, 459 P.2d 572 (1969).

Appellate review of the propriety of a mistrial declaration under the "manifest necessity" standard "abjures the application of any mechanical formula by which to judge the propriety of declaring a mistrial in the varying and often unique situations arising during the course of a trial." *Illinois v. Somerville,* 410 U.S. at 462, 93 S.Ct. at 1069, 35 L.Ed.2d at 429. To be sure, the decision to abort a criminal proceeding after jeopardy already has attached is not one to be made lightly, implicating as it does the weighty interest of the accused in having the charge determined by the jury already impaneled and sworn. *E.g., Illinois v. Somerville, supra; United States v. Jorn,* 400 U.S. 470, 91 S.Ct. 547, 27 L.Ed.2d 543 (1971); *People v. Mason,* 643 P.2d 745 (Colo.1982); *Ortiz v. District Court, supra.* This is not to say, however, that the "manifest necessity" standard prohibits a trial court from declaring a mistrial except under circumstances where the refusal to do so would constitute reversible error. *E.g., Falgout v. People, supra; Brown v. People,* 132 Colo. 561, 291 P.2d 680 (1955). Nor is the trial court constitutionally required to make explicit findings on manifest necessity. *E.g., Arizona v. Washington, supra; Ortiz v. District Court, supra.* Manifest necessity encompasses those situations, substantial and real, that interfere with or retard "the administration of honest, fair, even-handed justice to either,

both, or any, of the parties to the proceeding." *Brown v. People,* 132 Colo. at 569, 291 P.2d at 684.[8] In assessing the propriety of the trial court's action, the asserted reason for the mistrial must be closely scrutinized against the backdrop of the record to determine whether, in the context of a particular case, the mistrial declaration was substantially justified. *See, e.g., Arizona v. Washington, supra; Illinois v. Somerville, supra; Ortiz v. District Court, supra; Brown v. People, supra.*

A review of the record discloses a substantial justification for the mistrial declaration. The mistrial motion was prompted by an event beyond the control of the prosecution: the sudden hospitalization of Mr. Mares, who was both the victim of and principal eye witness to the shooting, on the eve of opening statements and the presentation of testimony. The credibility of witnesses obviously would be a weighty factor in the jury's verdict, and, if at all practicable, the prosecution was entitled to present its version of the facts through the courtroom testimony of the victim. The record shows that the treating physician of Mr. Mares believed he would be hospitalized at least for two more days, through Friday of that week and possibly longer, and that if Mr. Mares was physically able to testify at all within the days next following, he would be under sedation and his testimony could not exceed two hours. Under these circumstances, a continuance of two days or even more offered no assurance that the witness would be sufficiently recovered at the end of that period of time to testify in this matter. Were we to hold that some other action should have been taken, we would only be second guessing the trial court's assessment of the criticalness of the victim's testimony to the prosecution's case and, as well, the trial court's implicit determination that without such testimony the

---

8. The failure of the court to employ alternatives other than a mistrial declaration, while obviously a significant factor in evaluating the presence of a manifest necessity, does not by itself render the declaration constitutionally infirm. If a retrial were to be automatically barred merely because a reviewing court disagreed with the trial judge's assessment of the situation there present, trial judges would be substantially impaired in their efforts to take remedial action to satisfy the legitimate ends of public justice in appropriate cases. *See Arizona v. Washington,* 434 U.S. 497, 513, 98 S.Ct. 824, 834, 54 L.Ed.2d 717, 733 (1978).

ends of public justice would be defeated. Furthermore, the mistrial motion was made at the very outset of the trial, before the expenditure of time and effort in the presentation of testimony and evidence to the jury. Under the totality of circumstances present here we cannot say that the mistrial declaration was not supported by manifest necessity.

## VII.

The defendant next contends that the defense attorney's representation of the district attorney in separate litigation, while simultaneously representing the defendant in this case, created a conflict of interest which denied him effective assistance of counsel. We agree with the defendant's claim.

The United States and Colorado Constitutions guarantee an accused in a criminal prosecution the right to effective assistance of counsel. *U.S. Const.* Amends. VI and XIV; *Colo. Const.* Art. II, Sec. 16. This right may be violated not only by representation that falls below the level of competence to be expected of a reasonably competent attorney practicing criminal law, *see, e.g., McMann v. Richardson,* 397 U.S. 759, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970); *People v. Stroup,* 656 P.2d 680 (Colo.1982);

*People v. Blalock,* 197 Colo. 320, 592 P.2d 406 (1979), but also by representation that is intrinsically improper due to a conflict of interest, *see, e.g., Holloway v. Arkansas,* 435 U.S. 475, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978); *Glasser v. United States,* 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed 680 (1942); *Allen v. District Court,* 184 Colo. 202, 519 P.2d 351 (1974).[9] A mere potential conflict of interest, however, is not the equivalent of ineffective assistance of counsel. *Cuyler v. Sullivan,* 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980). Rather, when no objection has been raised during trial concerning the alleged conflict, a constitutional predicate for a postconviction claim of ineffective assistance of counsel requires a showing that the attorney's representation of the defendant conflicted with some other interest that the attorney also had professionally undertaken to serve. *Id.* at 348, 100 S.Ct. at 1718, 64 L.Ed.2d at 346–47. If an accused demonstrates that his lawyer labored under an actual conflict of interest during the trial, a showing of actual prejudice is not a condition for relief. Indeed, as the United States Supreme Court has observed, such a showing would often be impossible:

> "[I]n a case of joint representation of conflicting interests the evil—it bears re-

---

**9.** A lawyer's duty, both to the client and the legal system, is to represent the client zealously within the bounds of the law. Colo. Code of Prof. Resp., DR7–101. Recognizing the fundamental tension inherent in the simultaneous representation of competing interests, our Code of Professional Responsibility prohibits a lawyer from continuing his multiple employment "if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by his representation of another client, or if it would be likely to involve him in representing differing interests . . . ." Colo. Code of Prof. Resp., DR5–105(B); *see Allen v. District Court,* 184 Colo. 202, 519 P.2d 351 (1974). Conflict of interest claims due to a lawyer's simultaneous representation of competing interests echo multiple variations of a common theme—the struggle of a lawyer to serve competing masters. Recurring situations include the simultaneous representation of codefendants in the same case, *e.g., Cuyler v. Sullivan,* 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980); *Holloway v. Arkansas,* 435

U.S. 475, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978); *Glasser v. United States,* 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942); the representation of a defendant in a criminal prosecution while also representing the victim of the crime in a separate civil proceeding, *e.g., United States ex rel. Miller v. Myers,* 253 F.Supp. 55 (E.D.Pa. 1966); the simultaneous representation of a defendant and a prosecutorial witness in a civil proceeding, *Castillo v. Estelle,* 504 F.2d 1243 (5th Cir.1974); *United States ex rel. Williamson v. LaVallee,* 282 F.Supp. 968 (E.D.N.Y. 1968); and also the representation of a defendant in a criminal case that was investigated or the prosecution of which was commenced while the defense attorney or an associate was employed in the prosecutor's office responsible for the prosecution, *e.g., United States v. Miller,* 624 F.2d 1198 (3d Cir.1980); *United States v. Kitchin,* 592 F.2d 900 (5th Cir.1979), *cert. denied,* 444 U.S. 843, 100 S.Ct. 86, 62 L.Ed.2d 56 (1979); *United States v. Dorfman,* 542 F.Supp. 402 (N.D.Ill.1982).

peating—is in what the advocate finds himself compelled to *refrain* from doing, not only at trial but also as to possible pretrial plea negotiations and in the sentencing process. It may be possible in some cases to identify from the record the prejudice resulting from an attorney's failure to undertake certain trial tasks, but even with a record of the sentencing hearing available it would be difficult to judge intelligently the impact of a conflict on the attorney's representation of a client. And to assess the impact of a conflict of interests on the attorney's options, tactics and decisions in plea negotiations would be virtually impossible. Thus, an inquiry into a claim of harmless error here would require, unlike most cases, unguided speculation." *Holloway v. Arkansas,* 435 U.S. at 490–91, 98 S.Ct. at 1182, 55 L.Ed.2d at 438.

*See also, e.g., Cuyler v. Sullivan, supra; Glasser v. United States, supra; United States ex rel. Williamson v. LaVallee,* 282 F.Supp. 968 (E.D.N.Y.1968).

As in the case of other constitutional rights, an accused may waive his right to conflict-free representation. The burden of affirmatively demonstrating a waiver of such a fundamental right rests upon the prosecution and will not be presumed from a silent record. *See, e.g., Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981); *Brewer v. Williams,* 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977); *Carnley v. Cochran,* 369 U.S. 506, 82 S.Ct. 884, 8 L.Ed.2d 70 (1962); *Von Moltke v. Gillies,* 332 U.S. 708, 68 S.Ct. 316, 92 L.Ed. 309 (1948); *Johnson v. Zerbst,* 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938).

In this case the defendant's claim of ineffective assistance of counsel is not grounded on an allegation that defense counsel failed to employ those basic trial skills expected of a reasonably competent practitioner of criminal law. Rather, the defendant rests his claim upon a real and substantial conflict of interest on the part of defense counsel. In resolving this claim we must determine: (1) whether the defense attorney's simultaneous representation of the district attorney in other litigation constituted an actual conflict of interest; and (2) whether, if such conflict existed, the defendant understandingly waived his right to conflict-free representation.

### A.

In denying the defendant's motion for postconviction relief under Crim.P. 35(c), the trial court attributed no significance whatever to defense counsel's simultaneous representation of District Attorney Losavio and the defendant. By ignoring this critical factor the trial court's resolution of the defendant's motion was fatally flawed.

Mr. Losavio, as District Attorney for the Tenth Judicial District, was legally obligated to appear on behalf of the state in all criminal cases "pending in the district court in any county within his district." Section 20–1–102(1)(a), C.R.S.1973 (1978 Repl.Vol. 8). The criminal information in this case was expressly brought by "J.E. Losavio, Jr., District Attorney within and for the Tenth Judicial District of the State of Colorado, in the name and by the authority of the People of the State of Colorado" and was signed by Losavio's chief deputy on his behalf. That the district attorney might have legally delegated his authority to prosecute this case to his chief deputy or assistant is of no significance here. Deputy and assistant district attorneys function only by virtue of the district attorney's authority. The acts of deputies and assistants are done in the name of the district attorney, section 20–1–206, C.R.S.1973 (1978 Repl.Vol. 8), and their knowledge and official actions are imputable to the district attorney. *See DeLuzio v. People,* 177 Colo. 389, 494 P.2d 589 (1972).

What we have here, therefore, is an effort by defense counsel to represent the defendant in a class 2 felony commenced and prosecuted under the authority of the district attorney, while simultaneously representing the district attorney in a legal challenge to an electors' petition to recall him from office and, further, in a criminal prosecution accusing him of overspending his budget. A lawyer representing such

conflicting interests cannot avoid being adversely affected at various stages of the criminal prosecution of an accused. The district attorney's office, for example, in order to avoid any appearance of favoritism, might well take an unusually hard line on plea bargaining to the disadvantage of the defendant. Defense counsel, in turn, might be reluctant to incur the disfavor of her other client, the district attorney, by pressing hard for the best possible plea bargain for the defendant. Nor can a similar tension fail to make itself felt in defense counsel's performance during the trial itself. Defense counsel, on the one hand, owed the defendant the duty of zealously seeking an acquittal or other favorable disposition without regard for any adverse impact such favorable result might hold out for the district attorney as an elected official. On the other hand, defense counsel owed her undivided loyalty to the district attorney as her client, and her professional responsibility in this respect implicitly included refraining from taking any legal action that might place him in public disfavor and further exacerbate the efforts of electors to oust him from office through a recall petition. It is inconceivable that a defense attorney in these circumstances could be oblivious to the fact that an acquittal might well add fuel to the voters' effort to recall the district attorney. The extent to which such an apprehension may have consciously or unconsciously manifested itself in defense counsel's performance is a matter we need not decide here. What is critical, in our view, is the presence of a real and substantial conflict that placed the defense attorney in a situation inherently conducive to and productive of divided loyalties.

We find the reasoning of the court in *Zuck v. State of Alabama,* 588 F.2d 436 (5th Cir.1979), *cert. denied,* 444 U.S. 833, 100 S.Ct. 63, 62 L.Ed.2d 42 (1979), persuasive in this respect. There the law firm that served as counsel for Zuck in a murder trial also represented in an unrelated civil matter the state prosecutor who tried Zuck. Finding that such dual representation created an actual conflict of interest which undermined the defendant's constitutional right to effective assistance of counsel, the court stated:

"The prosecutor and the defense attorneys here were adversaries for the purpose of this trial. It is sufficient to establish a constitutional violation that the defense attorneys owed a duty to Zuck to endeavor to refute the prosecutor's arguments and to impeach his witnesses. This being so, the same concern which underlays *Castillo* [*Castillo v. Estelle,* 504 F.2d 1243 (5th Cir.1974) (involving the simultaneous representation of a criminally accused and a prosecutorial witness in a civil proceeding)] is also present here: the defense attorneys were subject to the encumbrance that the prosecutor might take umbrage at a vigorous defense of Zuck and dispense with the services of their firm. Indeed, the potential prejudice arising from the conflict here is even greater than that found in *Castillo,* in which the danger of ineffective representation was limited to the cross-examination of a single prosecution witness. Here, the conflict could conceivably have infected the entire trial."

\* \* \* \* \* \*

"A defense attorney must be free to use all his skills to provide the best possible defense for his client. Despite the noblest of intentions, the defense attorneys here may have been tempted to be less zealous than they should have been in the presentation of Zuck's case. This possibility is sufficient to constitute an actual conflict of interest as a matter of law." 588 F.2d at 439–40.

## B.

We turn next to the issue of waiver, a matter also not addressed by the trial court. An accused's right to conflict-free representation is implicit in the right to effective assistance of counsel. *E.g., Holloway v. Arkansas, supra; Glasser v. United States, supra; Allen v. District Court, supra.* A valid waiver is shown only if the prosecution establishes that the defendant

was aware of the conflict and its likely effect on the attorney's ability to offer effective representation and that the defendant thereafter voluntarily, knowingly and intelligently relinquished his right to conflict-free representation. *See United States v. Curcio,* 680 F.2d 881 (2d Cir.1982); *United States v. Agosto,* 675 F.2d 965 (8th Cir.1982); *see also Edwards v. Arizona, supra; Holloway v. Arkansas,* 435 U.S. at 483, n. 5, 98 S.Ct. at 1178, n. 5, 55 L.Ed.2d at 433, n. 5; *Brewer v. Williams, supra; Johnson v. Zerbst, supra.*

■ The evidence at the postconviction hearing shows unequivocally that the only admonition given to the defendant by defense counsel about the conflict was that the defendant could expect no special favors by reason of defense counsel's simultaneous representation of District Attorney Losavio. This admonition is totally inadequate to inform the defendant of the specific manner in which the conflict might affect his attorney's representation at various stages of the prosecution.[10] There was no other evidence offered by the state to demonstrate the defendant's comprehension of the nature of the conflict, including the hazards it posed for him. Nor was there any evidence demonstrating the defendant's voluntary, knowing and intelligent relinquishment of his constitutional right to conflict-free representation. What the evidence shows, at most, is the defendant's failure to raise an objection when defense counsel informed him that she also was representing the district attorney in anoth-

er matter. This acquiescence hardly amounts to a demonstration that the defendant understandingly waived his right to conflict-free representation, particularly where, as here, defense counsel never adequately explained to the defendant the nature of the right itself and the hazards which the conflict posed for the defendant in the pending prosecution. With such a record before us we conclude that the defendant was denied his right to effective assistance of counsel at trial in violation of the United States and Colorado Constitutions. *U.S. Const.* Amends. VI and XIV; *Colo. Const.* Art. II, Sec. 16.

The judgment is reversed and the cause is remanded for a new trial.

**10.** Once a potential conflict of interest becomes reasonably apparent, the attorney should inform the client of the nature of the conflict and, in plain terms, describe the specific ways in which the conflict may affect the attorney's ability to effectively represent the defendant at various stages of the pending litigation. The defense attorney then should place on record the potential conflict of interest and further advise the court that as complete a disclosure as possible has been made to the defendant. *E.g., United States v. Curcio,* 680 F.2d 881 (2d Cir.1982); *United States v. Agosto,* 675 F.2d 965 (8th Cir.1982). If the court, upon inquiry of the defendant, is satisfied that he understandingly (voluntarily, knowingly and intelligently) waives all conflicts that are reasonably

foreseeable under the circumstances, then it may accept the waiver, even though it views the defendant's decision as an improvident one.

"If the defendant reveals that he is aware of and understands the various risks and pitfalls, and that he has the rational capacity to make a decision on the basis of this information, and if he states clearly and unequivocally ... that he nevertheless chooses to hazard those dangers, we would regard his waiver as knowing and intelligent and allow his choice to 'be honored out of "that respect for the individual which is the life blood of the law." ' " *United States v. Curcio,* 680 F.2d at 888–89, quoting *Faretta v. California,* 422 U.S. 806, 834, 95 S.Ct. 2525, 2540, 45 L.Ed.2d 562, 581 (1975).