The PEOPLE of the State of
Colorado, Petitioner,

v.

John Jacob MARTINEZ, Respondent.

No. 92SC564.

Supreme Court of Colorado,
En Banc.

Feb. 28, 1994.

Gale A. Norton, Atty. Gen., Stephen K. ErkenBrack, Chief Deputy Atty. Gen., Timothy M. Tymkovich, Sol. Gen., John Daniel Dailey, Deputy Atty. Gen., Robert Mark Russel, First Asst. Atty. Gen., A. William Bonner, Asst. Atty. Gen., Denver, for petitioner.

David Hartley, Colorado Springs, for respondent.

Justice ERICKSON delivered the Opinion of the Court.

We granted certiorari to review *People v. Martinez*, No. 88CA0455 (Colo.App. June 18, 1992). John Jacob Martinez (Martinez) was tried and convicted of first-degree murder and of being an habitual criminal. The trial judge imposed a life sentence for first-degree murder and a life sentence on the habitual criminal conviction. The court of appeals vacated the life sentence imposed on Martinez as an habitual criminal and that issue is not before us for review. The issue addressed by the court of appeals that we must determine is whether Martinez waived or was denied his right to conflict-free representation under the facts of this case.

Prior to trial, after an extended evidentiary hearing, the trial judge found that Martinez knowingly, voluntarily, and intelligently waived his right to conflict-free representa-

tion. Martinez appealed and the court of appeals remanded the case to the trial court to determine if Martinez properly waived his right to conflict-free representation.

Because the record supports the trial court's finding that Martinez waived his right to conflict-free representation, a remand is not necessary under the facts of this case to determine the issue of waiver of conflict-free representation. Accordingly, we reverse and remand this case to the court of appeals with directions to reinstate the judgment of conviction and the sentence imposed by the trial judge for first-degree murder.

## I

### A

On April 18, 1987, Charles Walker (Walker), Martinez's neighbor, was stabbed to death. On that night, there was a party at Martinez's residence. At approximately 1:30 a.m., Walker came out of his house and confronted Martinez. Walker told Martinez that one of the individuals at the party had urinated on his garage door. Martinez and Walker began to fight and after a few minutes, Martinez ran into his house and returned brandishing a knife. Martinez confronted Walker and jabbed the knife at him. Walker did not initially retreat and showed a willingness to continue the fight. Ultimately, however, Walker turned and ran from Martinez. Martinez and one of his friends pursued Walker when he fled.

Walker's girlfriend witnessed the argument and the fight in front of the house. When Walker fled, she quickly dressed and attempted to follow him. She later located Walker a few blocks away, lying on the ground, alone and bleeding. She helped Walker up and they began to walk to their house. As they were walking, Walker told his girlfriend that he was dying. Before they reached their house, Martinez approached the couple from behind, slapped Walker on the back, and told him: "You're not hurt, Bud. Come on. You're OK." Martinez then raised his fist in a threatening manner toward Walker's girlfriend and asked her if the police would be contacted.

After confronting the couple, Martinez returned to his home. While at his residence, a witness to the fight asked Martinez what happened; Martinez replied, "I stabbed him." Subsequently, Martinez and his girlfriend went to the home of Gregory Keith Harris (Harris) and Susan Olguin (Olguin). After arriving at Harris' and Olguin's house, Martinez told Harris that he "cut a guy five times" in a fight that began when one of Martinez's friends was accused of urinating on a garage door. Harris later testified that Martinez had blood on his clothes when he arrived at the house. Harris' ten-year-old daughter also recalled seeing blood on Martinez's clothes and later watching Olguin wash the blood from the clothes.

Shortly after the fight occurred, paramedics transported Walker to the hospital. Walker died the following day due to loss of blood from multiple stab wounds. An autopsy revealed that Walker suffered at least eight stab wounds during the attack including cuts to his face, scalp, and scrotum. One wound went completely through Walker's back and cut a vein leading to his heart; another wound severed the muscles in Walker's arm.

Police later executed a search warrant on Martinez's residence. They discovered blood stains on the front door knob, on the wallboard of the bathroom, and on Martinez's gym shoes. Forensic experts determined that the blood found by the police matched Walker's blood-type. Martinez was arrested and indicted for first-degree murder and crime of violence. The prosecution later filed three habitual criminal counts against Martinez.

### B

When charges were filed, counsel was appointed to represent Martinez (defense counsel). Defense counsel represented Martinez on several pretrial motions and at his trial, which began on January 25, 1988.

On the second day of trial, Olguin, Harris, Harris' daughter, and Martinez's girlfriend failed to appear in compliance with their subpoenas. The prosecutor obtained a continuance to locate the missing witnesses. On

January 29, 1988, Harris and Olguin were apprehended by the Colorado Springs police. Harris and Olguin told the police and the investigators from the district attorney's office that they did not appear because defense counsel told them that it would be better for Martinez if they did not show up for the trial. As a result of Harris' and Olguin's allegations, the prosecutor concluded that a grievance should be filed with the Office of Disciplinary Counsel of the Colorado Supreme Court against defense counsel for advising the witnesses not to appear.

On February 8, 1988, the trial court conducted an evidentiary hearing at the request of the prosecution. At the hearing, the prosecution advised the court, defense counsel, and Martinez that the prosecution intended to file a grievance against Martinez's attorney, and that the prosecution was concerned that filing a grievance would create conflicts of interest. Defense counsel denied the allegations, but requested that he be allowed to withdraw from representing Martinez.

The trial court asked Martinez if he understood how the witnesses' allegations and the prosecution's decision to file a grievance affected defense counsel's ability to effectively represent him. Martinez replied that he had heard and understood the discussion regarding the conflicts. The judge then asked Martinez if he still wanted his attorney to continue to represent him or if he wanted a new attorney. Martinez responded that Harris' and Olguin's allegations against his attorney were not credible because they were liars and that he did not need a new attorney. When asked whether he understood that there might be conflicts in the future, Martinez told the court that he would let his attorney make any decisions regarding future conflicts.

The trial judge was not certain that Martinez fully understood the magnitude of defense counsel's alleged conflicts and the effect of the conflicts on the defense of the case. A recess was ordered by the trial judge to allow Martinez to consult with his attorney regarding the conflicts of interest.

The following day, the trial judge again considered whether defense counsel should continue to represent Martinez. The trial judge concluded that continuing the trial and appointing a new attorney would be unfair to Martinez and held that in order to avoid any conflicts of interest and to prevent his attorney from being called as a witness, neither the prosecution nor the defense would be permitted to ask Harris or Olguin why they did not appear in compliance with their subpoenas.

The court then questioned Martinez regarding whether he understood the conflicts of interest. Martinez replied that he understood how the conflicts might affect his counsel's performance and that another attorney would not be affected in the same manner. Martinez objected to any further delay in his trial and suggested that he would rather represent himself than postpone his trial any longer and said that he would leave all decisions to his attorney.

Following a recess, the prosecutor pointed out to the court and to Martinez his perception of the conflicts of interest and the issues raised by the witnesses' failure to appear. The prosecutor also informed the court of a conflict of interest between defense counsel and a possible suspect, Charlie Blea (Blea). Blea was a former client of Martinez's attorney in an unrelated criminal case and was at the party at the Martinez residence on the night the homicide occurred.

Finally, the prosecutor requested that the court appoint an attorney to advise Martinez of the conflicts involved in defense counsel continuing as trial counsel. The court told Martinez that if a grievance were filed against defense counsel, it might limit his ability to negotiate a favorable plea bargain. Martinez stated he did not want a plea bargain and that he "wanted to go to trial last month."

On February 12, 1988, the trial court read a letter from Martinez into the record which stated: "Evaluating the subject that was discussed in your chambers at the beginning of this week, I wish to make the decision of keeping my attorney and going to trial on the scheduled date." Nevertheless, the trial judge appointed attorney Frank Simons (Simons) to advise Martinez on the possible adverse effects of the conflicts and continued

the hearing to allow Simons and Martinez to discuss the conflicts.

On February 17, 1988, another hearing was held regarding whether defense counsel should continue to represent Martinez. Simons informed the court that he reviewed with Martinez all of defense counsel's "potential and actual conflicts" that were apparent to him. Simons stated that Martinez was well informed, aware of what he was doing, and had no unanswered questions.[1] Martinez then told the court that he understood the conflicts and waived them.

The trial court asked Martinez if he understood how the possible conflicts could affect his attorney's performance. Martinez stated that he understood another attorney might be able to get him a better plea bargain, but he did not want to plea bargain. Martinez also said that he understood another attorney would be able to ask Harris and Olguin why they did not appear for trial. The court advised Martinez that it was prepared to appoint another attorney "if you want one." Martinez again replied that he understood that he had a right to a different attorney but did not want another attorney.

The trial judge also told Martinez that if a conflict existed, Martinez, by his actions and statements, waived the right to raise the claim later in this case or on appeal. The defendant replied: "I understand I'm waiving my rights." Martinez verified that he understood the implications of the waiver when he told the trial judge that he waived the conflicts, his waiver was voluntary, he was not under the influence of any drugs or medications, and he fully understood his attorney's, Simons', the prosecutor's, and the court's explanations of the possible conflicts of interest.

Even at this stage, the court did not accept Martinez's waiver of the possible conflicts involving defense counsel. Instead, the court

reviewed with Martinez all of the assertions contained in defense counsel's motion to withdraw. The judge read into the record each of the twelve grounds for withdrawal in the motion. When the trial judge read the motion to withdraw, he questioned Martinez on whether he understood the basis for the motion. In instances where the ground set forth in the motion was complex, the trial judge discussed the implications of the allegation, or ground for withdrawal, with Martinez. In all twelve instances, Martinez replied that he understood and waived any conflicts.

Based on the multiple hearings, the testimony of Simons, and Martinez's responses to his attorney's, the prosecution's, and the court's repeated explanations and questions, the court found that Martinez voluntarily, knowingly, and intelligently waived the conflicts with his attorney.

Martinez now maintains that due to the inadequacy of the advisement regarding defense counsel's conflicts of interest, a new trial should be granted.

## II

■ The right of effective assistance of counsel includes the right to conflict-free representation by counsel. *Holloway v. Arkansas*, 435 U.S. 475, 483–84, 98 S.Ct. 1173, 1178–79, 55 L.Ed.2d 426 (1978); *Rodriguez v. District Court*, 719 P.2d 699, 706 (Colo.1986). Although ineffective assistance of counsel may be asserted by a defendant when his counsel has been found to have a conflict of interest, it will not be found if the defendant waived his right to conflict-free representation, and if such waiver is made with full knowledge of the actual conflict.[2] *People v. Castro*, 657 P.2d 932, 944 (Colo.1983); *Armstrong v. People*, 701 P.2d 17, 19 (Colo.1985).

---

1. Simons also told the court that he was convinced that Martinez understood the conflicts of interest and that Martinez was a bright individual who asked intelligent questions and made astute observations.

2. A defendant may waive the right to conflict-free representation, even though by such waiver the defendant, in all probability, will receive repre-

sentation which is less effective than representation which could be provided by conflict-free counsel. *Holloway v. Arkansas*, 435 U.S. 475, 483, 98 S.Ct. 1173, 1178, 55 L.Ed.2d 426 (1978); *United States v. Unger*, 700 F.2d 445, 448 (8th Cir.), *cert. denied*, 464 U.S. 934, 104 S.Ct. 339, 78 L.Ed.2d 308 (1983); *Rodriguez v. District Court*, 719 P.2d 699, 706 (Colo.1986).

■ In order to waive the constitutional protection of conflict-free counsel, a defendant must be fully advised of existing or potential conflicts. *Castro,* 657 P.2d at 944. The prosecution bears the burden of establishing (1) that the defendant was aware of the conflict and its likely effect on the defense attorney's ability to offer effective representation, and (2) that the defendant thereafter voluntarily, knowingly, and intelligently relinquished his right to conflict-free representation. *Holloway,* 435 U.S. at 483, 98 S.Ct. at 1178; *Castro,* 657 P.2d at 945–46; *see also Brewer v. Williams,* 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977) (regarding intentional relinquishment or abandonment of a known right or privilege). The record must affirmatively show that the trial court fully explained the nature of the conflict and the difficulties defense counsel faced in his effective advocacy for the defendant. *See Wheat v. United States,* 486 U.S. 153, 161, 108 S.Ct. 1692, 1698, 100 L.Ed.2d 140 (1988).

### III

Martinez contends that there are three conflicts which warranted more thorough discussion before he waived his right to conflict-free counsel: (1) defense counsel's prior representation of Blea; (2) the implications of the prosecution's decision to file a grievance against defense counsel; and (3) the impact of any conflict on plea negotiations.

### A

■ Martinez was advised that his attorney had represented Blea in an unrelated case and that Blea would be a witness in this case. The court discussed the conflict with Martinez:

3. During the discussions regarding the witnesses' allegations, the prosecutor stated that he was raising the issue of whether Martinez understood the conflict regarding Blea to:

supplement the record with one other thing that we brought up prior to trial, and the defendant waived on that, but I think it ought to be brought in because I don't know if it gets to the point that you have so many things coming in—that the defendant ought to be weighing that [defense counsel] did represent Charlie Blea, represented him up until he was sentenced to prison.

The court: Different things could happen.... You might think that [your attorney's] loyalties are with Mr. Blea, and he'd be trying to protect Mr. Blea if he was to question him.

Martinez: No. I don't think he's trying to protect Mr. Blea at all.

The court: Okay. Anyway, there's potential for conflict there that none of us could maybe foresee. Do you waive those conflicts as well?

Martinez: Yeah.

There is evidence in the record that this conflict had been discussed with Martinez on a prior occasion and that he had waived it prior to the hearings regarding the witnesses' allegations.[3] The court's clear explanation of the conflict relating to Blea, and Martinez's acceptance of the implications of the conflict, establishes that Martinez waived the conflict regarding Blea.

### B

■ At the first hearing on the issue of defense counsel's conflicts, the prosecution informed the court that it intended to file a grievance against Martinez's attorney based on the statements of Olguin and Harris that he encouraged them not to comply with their subpoenas and appear at trial. The prosecutor stated:

If the case goes to trial, like in all likelihood it will, the question then arises about the conflict of interest. If [defense counsel] ask[s] Susan Olguin and Keith Harris when they testify, "How come you didn't show up last time?" and they gave [defense counsel's alleged statement that they should not appear at trial as their reason,] it's a conflict. For that reason we believe

The issue of the conflict regarding Blea was addressed on two occasions and Martinez waived the conflict.

In addition, prior to the trial, Martinez waived the right to speedy trial and his right to be present at a hearing. In both cases, Martinez understood the implications of waiving a right and why the waiver was necessary. Martinez's familiarity with the process of waiving rights and the implication of a waiver indicates he was very capable of waiving his right to conflict-free counsel.

that it's a conflict of interest for defense counsel to be on the case.

The colloquy continued and the prosecutor said:

The only way I think it comes up at the trial level is when the witnesses that are going to be testifying—they will be our witnesses; they will be testifying against the defendant—are cross examined, they cannot—they won't be able to be cross examined by [defense counsel], it seems to me, on the issue of why they didn't appear that first time because one of the reasons they didn't appear, so they'll say, is because of what [he] led them to believe would happen and how important they were.

I think it also weighs on their credibility that they didn't appear. I have to show why they are still credible witnesses when they appear. So I might be asking those questions of why they didn't appear at the last trial.

Martinez was present during this discussion and at the end of the prosecutor's explanation of the conflict the court asked Martinez if he understood. Martinez responded that he understood the conflict, that Olguin and Harris were liars, and that he did not want a new attorney.

At the final hearing, the court again advised Martinez how a grievance might affect the representation:

The court: Do you understand that another attorney might be more effective in assisting you at trial than [defense counsel]?

Martinez: I don't see how.

The court: Well, there's certain questions that another attorney may be able to ask that [defense counsel] can't ask, okay? Like why Miss Olguin and Mr. Harris didn't show up for trial.

Martinez: Yeah.

The court: Do you understand that?

Martinez: Yeah.

The court: Okay. There are several things that we've talked about when you were here that indicated that maybe a different attorney could be more effective in assisting you. Do you understand that?

Martinez: Yeah.

The court: And I am prepared to appoint a different attorney to represent you today if you want one. Do you understand that?

Martinez: Yeah. I don't want no other attorney.

Immediately before and after this advisement, Martinez reiterated his desire to keep his attorney and proceed to trial on the scheduled date. The record demonstrates that Martinez's principal concern was not the problem of whether his attorney would be able to cross-examine or impeach Olguin and Harris, but going to trial immediately. There is sufficient evidence in the record to support the trial court's finding that Martinez waived the conflict created by the witnesses' allegations.

C

 The prosecution stated that as a result of the pending grievance against Martinez's attorney it was reluctant to negotiate a plea bargain. Martinez now asserts that by maintaining his attorney, he was denied the opportunity to enter a plea bargain.

In the initial hearing, after the prosecutor disclosed the potential conflict regarding the witnesses' allegations against defense counsel, the prosecutor discussed with the court and Martinez the conflict regarding plea bargaining:

We saw a potential conflict . . . lets say we enter a plea bargain. . . . Then the defendant would come back and say, Gee, my defense attorney was advising me to take a plea because maybe he had an interest in the case also, and I want that plea overturned now because he was forcing me to do something that was in his interests, and I want to overturn this.

Or in the alternative, we went to trial and he came back later and said, Gee, I had incompetent counsel because now I find out that [the prosecution intends to file] a grievance against him and [defense counsel encouraged accepting] the plea bargain or gave me certain advice because he was trying to represent his own interests in this particular case.

Subsequently, Martinez's attorney again addressed the issue of the conflict regarding plea bargaining:

> Another issue ... [is] the fact that one of the reasons [the prosecution] felt that they could no longer offer a plea bargain to John Martinez is because of the conflict between he and I, i.e., [the prosecutor's] words were something to the effect that I would counsel John to take a plea bargain because of my conflict and not because of what's in his best interests.

In the final hearing, the court specifically advised Martinez regarding defense counsel's conflict in negotiating a plea bargain with the prosecution:

> The court: Okay. Do you understand that a different attorney, if appointed [for] you, may be able to get a better plea bargain for you under the circumstance now?
>
> The defendant: Yes. I don't want no plea bargain.

Thus, Martinez participated in extensive, thorough, and readily intelligible discussions on defense counsel's limitations in negotiating a plea agreement for Martinez. The record reflects that Martinez's central concern was going to trial as quickly as possible and any conflict regarding a possible plea bargain did not concern him because he wanted to prove his innocence, not plead guilty.

### IV

 We have recognized that a defendant's right to waive conflict-free representation is not unbounded. In some circumstances, fundamental considerations other than a defendant's desires are given controlling significance. These considerations relate to the paramount necessity of preserving the public confidence in the integrity of the administration of justice. *Rodriguez,* 719 P.2d at 706; *see also United States v. Hobson,* 672 F.2d 825, 828–29 (11th Cir.), *cert. denied,* 459 U.S. 906, 103 S.Ct. 208, 74 L.Ed.2d 166 (1982).

 In *Rodriguez,* we adopted a balancing test to determine under what circumstances the public confidence in the integrity of the judicial process outweighs the interest of a defendant in being represented at trial by a particular attorney whose effectiveness may be impaired by the presence of a conflict of interest. *Rodriguez,* 719 P.2d at 706–07. Among other factors, this test requires a court to evaluate the nature of the particular conflicts involved and the defendant's preference for a particular attorney. *Id.* In this case, these factors are determinative. *See id.* at 706 ("Other courts, while implicitly engaging in a balancing process, have expressly emphasized the nature of the conflict of interest itself in determining whether a knowing waiver of conflict-free representation by a defendant will permit continued representation by an attorney who must labor under the impediment of this type of conflict of interest."); *see generally* Ephraim Margolin & Sandra Coliver, *Pretrial Disqualification of Criminal Defense Counsel,* 20 Am.Crim.L.Rev. 227 (1981). We conclude that the trial court properly exercised its discretion in accepting Martinez's waiver of conflict-free counsel and in denying defense counsel's motion to withdraw. *See Riley v. District Court,* 181 Colo. 90, 93, 507 P.2d 464, 465 (1973).

The conflicts were of minor significance at trial. *See Rodriguez,* 719 P.2d at 707 (holding a waiver of the right to conflict-free representation was permitted in part because the conflict of interest "may prove of relatively minor significance at trial"); *United States v. Khoury,* 901 F.2d 948, 968 (11th Cir.1990) (holding that a defendant claiming ineffective assistance of counsel due to a conflict must point to specific instances in the record to suggest actual impairment of his interest).

 Although aware of the prosecution's intent to file a grievance against him, Martinez's attorney diligently represented the defendant at trial. He repeatedly pointed to allegedly careless police investigation procedures, including the fact that the investigation focused solely on Martinez to the exclusion of all other possible suspects. Defense counsel asserted there were several other suspects at the scene, including his former client, Charlie Blea, and that the police did not investigate any of the suspects. In our view, defense counsel's former representation

of Blea on an unrelated matter is a de minimis conflict that had no impact on the trial. *See Wycoff v. Nix,* 869 F.2d 1111, 1117–18 (8th Cir.), *cert. denied,* 493 U.S. 863, 110 S.Ct. 179, 107 L.Ed.2d 135 (1989) (holding it was not ineffective assistance of counsel when an attorney who represented the defendant had previously represented a prison guard who was a potential witness for the prosecution against the defendant; the attorney represented the guard in a separate unrelated matter, and the guard was not called to testify).

Similarly, the conflict regarding plea bargaining had no impact on Martinez. The record is replete with evidence that establishes Martinez was not interested in a plea bargain but was interested in going to trial as quickly as possible. Thus, any conflict that might have affected defense counsel's ability to plea bargain with the prosecution did not affect Martinez because he was not seeking a plea bargain.

As to the conflict with Harris and Olguin, the trial court's remedy of prohibiting either side from raising the issue of the witnesses' failure to appear at the first trial was within its discretion. *Cf. United States v. O'Malley,* 786 F.2d 786, 789–90 (7th Cir. 1986) (limiting examination of government witness by defendant is within the discretion of the court to prevent appearance of impropriety or to prevent attorney from having to testify in defendant's case). The trial court's remedy did not impair Martinez's defense; if anything, it hindered the prosecution's case. Although the trial court's remedy prohibited Martinez's attorney from impeaching Harris and Olguin with their failure to appear, the remedy also prohibited the prosecution from eliciting that they failed to appear because defense counsel allegedly told them it would be better for the defendant if they did not show up for the trial. Thus, the trial court's remedy of prohibiting either side from questioning Harris and Olguin regarding their failure to appear, and their reasons for failing to appear, prevented the introduction of statements that were prejudicial to Martinez's defense.

In addition to the de minimis impact of the conflicts, Martinez's desire to maintain his attorney is entitled to great weight. Even after the prosecution had urged the court to appoint new counsel for Martinez and his attorney had made repeated attempts to withdraw, Martinez stated that he wished to retain his present counsel notwithstanding any conflicts. Respect and deference must be accorded to Martinez's intelligent and informed choice of counsel under our system of justice. *United States v. Curcio,* 680 F.2d 881 (2d Cir.1982). The balance here, as in *Rodriguez,* weighs heavily in favor of Martinez's preference for continuing representation by his attorney. *Rodriguez,* 719 P.2d at 707.

Accordingly, the trial court properly accepted Martinez's waiver of his right to conflict-free representation and allowed defense counsel to represent Martinez during his jury trial.

## V

The record reflects that when the prosecution first raised the issue of whether the witnesses' allegations against Martinez's attorney created conflicts that required him to withdraw, the court, the attorneys, and Martinez all considered the implications of the conflicts. During the course of multiple discussions among the court, the prosecution, defense counsel, special counsel, and Martinez, the conflicts were fully explained to Martinez. The discussions were particularized, specific, and detailed. Each of the three conflicts was addressed and the court questioned Martinez regarding whether he was waiving the conflicts. At the last conference, Martinez indicated that he understood all of the ramifications of the conflicts and all of his questions regarding the conflicts had been answered. Based on his central concern of establishing his innocence as quickly as possible, he waived the conflicts in order to expedite the trial.

The record supports the trial court's finding that Martinez voluntarily, knowingly, and intelligently waived his right to conflict-free representation. Accordingly, we reverse the court of appeals and remand with directions to reinstate the judgment of conviction and

sentence imposed on Martinez by the trial judge for first-degree murder.

LOHR, J., dissents.

SCOTT, J., joins the dissent.

Justice LOHR dissenting:

The Colorado Court of Appeals remanded this case to the El Paso County District Court for a hearing to determine whether the defendant, John Jacob Martinez, effectively waived his right to conflict-free representation in proceedings that resulted in his conviction and sentence to life imprisonment for first degree murder. *People v. Martinez*, No. 88CA0455 (Colo.App. June 18, 1992) (not selected for publication). The court of appeals directed that if as a result of the hearing the trial court concludes that the waiver was effective, the judgment of conviction must stand affirmed but that if the waiver was ineffective, the judgment must be reversed and a new trial held. *Id.*, slip op. at 10. The majority concludes that the record supports the trial court's finding that Martinez effectively waived his right to conflict-free representation and that consequently a remand is not necessary. Maj. op. at 529. Because my reading of the record leads me to the conclusion that further proceedings are necessary to resolve the issue, I respectfully dissent and would affirm the judgment of the court of appeals.

## I.

I fully agree with the principles of law set forth in part II of the majority opinion. The right to effective assistance of counsel includes the right to conflict-free representation; a defendant who is fully advised of existing and potential conflicts may waive conflict-free representation; and the prosecution has the burden of establishing voluntary, knowing, and intentional waiver. See maj. op. at 524–525, and cases there cited. As the majority also recognizes, "[t]he record must affirmatively show that the trial court fully explained the nature of the conflict and the difficulties defense counsel faced in his effective advocacy for the defendant." Maj. op. at 525 (citing *Wheat v. United States*, 486 U.S. 153, 161, 108 S.Ct. 1692, 1698, 100

L.Ed.2d 140 (1988)). *See also United States v. Curcio*, 680 F.2d 881, 888 (2d Cir.1982) ("The first task of the trial court is to alert the defendants to the substance of the dangers of representation by an attorney having divided loyalties in as much detail as the court's experience and its knowledge of the case will permit."); *United States v. Garcia*, 517 F.2d 272, 278 (5th Cir.1975) ("district court should address each defendant personally and forthrightly advise him of the potential dangers of representation by counsel with a conflict of interest"); *Rodriguez v. Dist. Ct., City & Cty. of Denver*, 719 P.2d 699, 708–09 (Colo.1986) (independent judicial inquiry is necessary to determine whether defendant has voluntarily, knowingly and intelligently waived his right to conflict-free representation). *People v. Castro*, 657 P.2d 932, 945–46 (Colo.1983) ("valid waiver is shown only if the prosecution establishes that the defendant was aware of the conflict and its likely effect on the attorney's ability to offer effective representation and that the defendant thereafter voluntarily, knowingly and intelligently relinquished his right to conflict-free representation"). The record in the case before us does not show that Martinez was ever adequately informed by court or counsel of the rather complex implications of the conflicts faced by his counsel and therefore does not support the trial court's determination of voluntary, knowing, and intelligent waiver of the right to conflict-free counsel. The record does not disclose except in a general way the advice provided to Martinez off the record at the court's direction. The court of appeals remanded the case for further proceedings in order to determine whether on the basis of the knowledge and understanding derived by Martinez from advisements in and out of court he effectively waived his right to conflict-free counsel.

## II.

The conflicts of interest faced by defense counsel arose on two separate bases. On the second day of the trial in this case, Susan Olguin and Gregory Keith Harris, who had been subpoenaed by the prosecution, failed to appear, and the trial court granted a continuance on the motion of the prosecution. Days

later, the witnesses were found and arrested. Olguin and Harris asserted that they had not appeared for trial because defense counsel had advised them that it would be better for the defendant if they were absent. ·As a result of this allegation, the prosecution stated that it intended to file a grievance with the Supreme Court Grievance Committee against defendant's counsel.

A second basis for conflict existed. Defense counsel had recently represented, on unrelated criminal charges, a witness and potential suspect in the case, and time for filing a motion under Crim.P. 35(b) for reduction of sentence had not expired.

The conflicts resulted in extensive hearings to determine whether defense counsel would be permitted to withdraw and whether the defendant would waive conflict-free representation. The trial court ultimately denied defense counsel's motion to withdraw and concluded that the defendant had effectively waived his right to conflict-free counsel.

### III.

In order to assess whether the court of appeals was correct in holding that the record does not support the trial court's finding of voluntary, knowing, and intelligent waiver, it is necessary to review in some detail the trial court hearings on withdrawal of counsel and the waiver of conflict-free representation.

On February 8, 1988, at the prosecution's request and in the absence of any motion for relief, the defendant and counsel appeared before the court to enable the prosecutor to advise the court of a development in the case. The prosecutor stated that during interviews with prosecution witnesses Susan Olguin and Gregory Keith Harris after their arrests for failure to appear for trial, each stated that prior to trial Martinez told them to go to defense counsel's office "about leaving" and when they did, these "key witnesses" were told by defense counsel that if they did not show up for trial "it would go a hundred percent better for John Martinez." As a result, the prosecutors determined that they should file a grievance against. defense counsel for violation of the canons of ethics governing attorney conduct. The prosecutor told the court that this created a potential issue of ineffective assistance of counsel in any plea disposition that might be achieved and also that a conflict of interest would be presented if Olguin and Harris were asked at trial why they did not appear for the first trial, for in that event defense counsel would become a potential witness. The prosecutor expressed the view that it would be a conflict of interest for defense counsel to continue on the case.

Defense counsel, having just learned of the prosecutor's allegations shortly before they were presented to the court, expressed uncertainty as to how to proceed. The court suggested that Martinez might be able to waive the conflict. After the prosecutor elaborated on the problems presented for both the prosecution and the defense with respect to exploring the credibility of the witnesses if the conflict were addressed by preventing the witnesses from being questioned on their reasons for not honoring their subpoenas, the court decided to continue the proceeding to let defense counsel and the defendant consider the matter. Before doing so, however, the court engaged in the following colloquy with the defendant:

THE COURT: Mr. Martinez, do you understand that that—Well, you've heard what's going on here today.

THE DEFENDANT: Yes.

THE COURT: Do you understand it?

THE DEFENDANT: Yeah, I do.

THE COURT: Okay. Assuming—and I'm not saying it's true—but assuming that what the district attorney has said is true, would you want another attorney to represent you in this case or would you want to stay with [defense counsel]?

THE DEFENDANT: I would like to say assuming what the district attorney says, my opinion about Susan Olguin and Gregory Harris really is they're to me a bunch of liars. And as he says, their credibility towards this case, to me it proves that their credibility ain't no good. And as for having [defense counsel], off my case, I don't see what for. What they— What Harris and Olguin is saying, you know, what makes them believed to be

true? As you can tell, their credibility throughout this whole case—

THE COURT: Do you understand there may in the future be some a conflict between you and [defense counsel] although I can't frame it exactly? But it may be a conflict between you and [defense counsel]. Do you understand that?

THE DEFENDANT: I'll leave it up to my attorney, whichever he decides.

The court then expressed strong reluctance to take any action that would result in a continuance of the trial, stated that it could discern no conflict, and continued the proceeding to the following day.

At the outset of the proceeding on the next day, defense counsel expressed the desire to withdraw and requested and received permission to file a written motion requesting that relief. The court at its own instance announced the intent to resolve the conflict by preventing the prosecution from asking why Olguin and Harris had not appeared, thus eliminating the potential need for defense counsel to testify. The court maintained this position notwithstanding argument by the prosecution that inability to explore the issue of nonappearance might impair the defendant's ability to call the credibility of the witnesses into question by unfettered cross examination. The court then sought the defendant's view through the following exchange:

THE COURT: I'll ask John [the defendant]. Do you understand what's going on here?

THE DEFENDANT: Huh-huh.

THE COURT: And they're saying that it may affect [defense counsel's] representation of you so that he wouldn't be as good maybe as some other lawyer. Do you understand that?

THE DEFENDANT: Yeah.

THE COURT: What do you want to have happen? Do you want to have him stay on the case or do you want to get a new attorney?

THE DEFENDANT: Really I ain't in no position to say.

THE COURT: You are in a position to say. I want to know your opinion.

THE DEFENDANT: I don't see how. If I was in a position to say, I wouldn't ever be in here.

THE COURT: Aside from that. But I mean if you allow him to—if you want him to withdraw, that will affect my decision. But I can't—You know, that's up—I'm not going to leave it up to you, but I want your input on it. Do you want to keep him as your attorney or do you want another attorney because of this possible conflict?

THE DEFENDANT: I don't know how he's—how his attitude is toward me. I'll leave it up to him. Whatever he decides if he decides to withdraw from it. As for postponing the trial for longer and longer, I refuse that. I'd rather go on representing myself to the best of my knowledge because I'm tired of being in here accused—you know, accused every day with the what the People accuse me of. I straight up didn't do it. I came in here to turn myself in to deal with it.

THE COURT: I understand that, John. I understand that.

THE DEFENDANT: Seems like they can't consider that, though.

THE COURT: I know. We've got to deal with these technicalities as we go along, okay? And if I allow [defense counsel] to withdraw, it would be very difficult for you to go to trial by yourself without a lawyer. You need a lawyer, John. And that lawyer would have to have more time to prepare.

THE DEFENDANT: Like I said, Whatever [defense counsel] decides is fine with me.

The court then denied the request for withdrawal. The prosecutor argued that the defendant's responses did not reflect waiver, and the court continued the colloquy with the defendant as follows:

THE COURT: I understand. Do you understand, John?

THE DEFENDANT: Yeah.

THE COURT: We've got to know from you. There's a possible conflict here between you and your lawyer.

THE DEFENDANT: Like I say, I have no problem. I don't believe Susan and Gregory Harris whatever they say.

THE COURT: So you waive that conflict.

THE DEFENDANT: You know, I don't—You know, I'm in a situation where I can't decide. It's up to you guys, you know.

THE COURT: Well, at this point I've got to know whether you will waive that conflict.

THE DEFENDANT: I'm incarcerated. I'm in jail. I can't do too much.

THE COURT: Will you waive that conflict of interest—the possibility of a conflict of interest?

THE DEFENDANT: Well, I couldn't answer that now. I have to talk to my attorney to see, you know, how he feels about me or what's he feel about the whole thing.

THE COURT: Okay.

At the court's instance, defense counsel then talked with Martinez off the record during a recess in the proceedings. When the hearing reconvened, a prosecutor expressed concern that the record did not adequately reflect that the conflict had been explained to Martinez. He pointed out the conflict between the defendant's interest in a full examination of the witnesses and defense counsel's interest in not prejudicing the witnesses against him in view of the prospective grievance proceedings. The prosecutor also brought to the court's attention for the first time that defense counsel had represented Charlie Blea in an earlier criminal case and that Blea was now a prosecution witness and possible alternative suspect in the present case. The prosecutor noted that although Blea had been convicted and sentenced in the earlier case, the time for filing a motion for reduction of sentence under Crim.P. 35(b) had not yet expired and defense counsel "may still have an on-going relationship with Mr. Blea."

Defense counsel then stated that he had advised Martinez as to the advantages and disadvantages of allowing him to continue as counsel and had ultimately advised him not to waive his rights. He did not further detail the discussions.

At the prosecutor's earlier suggestion, the court then decided to appoint another attorney to advise Martinez. The court engaged in the following exchange with the defendant:

THE COURT: I'm going to appoint an attorney to talk to you, Mr. Martinez, about your rights, someone who's not involved in any of this at all right now, okay?

THE DEFENDANT: I don't want to waive my rights like I say.

THE COURT: That's fine. Can we talk to another attorney before we make that decision?

THE DEFENDANT: Well, another attorney—I don't see where another attorney is going to tell me—I already got— Like I said, these people are accusing me of this. I came up here as a suspect; they're trying to pin it on me, okay?

THE COURT: I know.

THE DEFENDANT: Prove it.

THE COURT: I want an attorney to talk to you, okay? I'll have to get my court-appointment list. ... I'll find somebody that can do it really fast.

The court then continued the hearing and in response to questions by the prosecutor about the purpose of the continued proceeding said:

THE COURT: Well, I think we have to let the attorney talk to Mr. Martinez and have him make a more informed decision about what he wants to do. And part of that hearing will be to determine what that decision is after he's been advised and what the ramifications of that decision are. *I don't think he understands 'em right now.*

(Emphasis added.)

On February 12 the hearing resumed. Present in addition to the parties and counsel were counsel retained by Martinez's defense attorney because of the grievance matter and the conflict advisement attorney appointed by the court. The court read into the record a letter received from Martinez stating: "Evaluating the subject that was discussed in your chambers at the beginning of this week,

I wish to make the decision of keeping my attorney and going to trial on the scheduled date." The court narrowed its exclusion ruling to relate only to alleged statements made by defense counsel to the witnesses suggesting they not appear for the trial. A prosecutor then argued that even with the narrowed ruling, defense counsel's performance would likely be subject to challenge as ineffective because the grievance would still create a conflict and inconsistent statements by one of the witnesses could not be explored, thus limiting evidence relevant to their general credibility.

Defense counsel then tendered a written motion to withdraw and reminded the court of the conflict inherent in the inhibition on plea bargaining resulting from the grievance. The attorney whom defense counsel had hired to represent him on the possible disciplinary charge also spoke at the hearing. He informed the court that he believed that the conflicts were "totally irresolvable." After further discussion of the nuances of conflict presented by defense counsel's continued representation, the court continued the hearing to allow conflict advisement counsel to meet with the defendant and advise him.

On February 17 the hearing continued. Conflict advisement counsel reported to the court and the following exchanges occurred:

[CONFLICT ADVISEMENT COUNSEL]: I went over and saw John on Monday I guess it was and went over everything that we had talked about in chambers last week in here, went over what I saw were [defense counsel's] potential and actual conflicts in the case and what I thought might happen as a result of those conflicts going unresolved and [defense counsel's] continuing to represent John. We discussed all those matters.

I think Mr. Martinez has a good idea of what he wants to do. I think he had a had a [sic] good idea before what he wanted to do. I think he's well informed. He knows what he's doing and doesn't have any unanswered questions with what is going on.

THE COURT: Okay.

[CONFLICT ADVISEMENT COUNSEL]: I'll let him speak for himself as to what he wants to do.

THE COURT: John?

THE DEFENDANT: Yeah. I want to keep my attorney and to go trial [sic] on the scheduled date.

THE COURT: Okay. Okay. The scheduled date would be the 22nd, which is next Monday.

The district attorney then asked that the defendant be advised:

[DEPUTY DISTRICT ATTORNEY]: Your Honor, I would ask the Court to advise the defendant on the record of the rights that he is giving up and ask him if he specifically waives those rights; the conflicts with the attorney, what they are, and have the record reflect that he does understand what those conflicts are; that he understands that he is waiving them. Thank you.

THE COURT: Okay.

THE DEFENDANT: I do understand, and I am waiving 'em.

THE COURT: Okay. Do you understand that a different attorney, if appointed to you, may be able to get a better plea bargain for you under the circumstances now?

THE DEFENDANT: Yes. I don't want no plea bargain.

THE COURT: Do you understand that another attorney might be more effective in assisting you at trial than [defense counsel]?

THE DEFENDANT: I don't see how.

THE COURT: Well, there's certain questions that another attorney may be able to ask that [defense counsel] can't ask, okay? Like why Miss Olguin and Mr. Harris didn't show up for trial.

THE DEFENDANT: Yeah.

THE COURT: Do you understand that?

THE DEFENDANT: Yeah.

THE COURT: Okay. There are several things that we've talked about when you were here that indicated that maybe a different attorney could be more effective in assisting you. Do you understand that?

THE DEFENDANT: Yeah.

THE COURT: And I am prepared to appoint a different attorney to represent you today if you want one. Do you understand that?

THE DEFENDANT: Yeah. I don't want no other attorney.

THE COURT: Okay. Do you understand you'd be giving up the right—Insofar as there is a conflict, you'd be giving up your right to assert that conflict or to use that conflict in any way now or in the future.

THE DEFENDANT: I don't really see no conflict here. I see a prosecution by the D.A. which he been doing from the start.

THE COURT: Okay. Well, whether it's true or false is really not important for purposes of this hearing. There are certain things that [defense counsel] may well not be able to do that another attorney could do for you. Do you understand that?

THE DEFENDANT: Well, [defense counsel's] been on my case for the past ten months. I am satisfied with him. I wish to go to trial on the scheduled date. I don't see no conflict. And that's where I stand.

THE COURT: Okay.

THE DEFENDANT: I understand I'm waiving my rights and—

THE COURT: Assuming, John, that there are some conflicts, do you waive those conflicts at this time?

THE DEFENDANT: Yeah.

THE COURT: Is that an absolutely voluntary decision on your part?

THE DEFENDANT: Yeah.

THE COURT: Okay. Do you understand what's going on here today?

THE DEFENDANT: Yeah.

. . .

THE COURT: Okay. And you fully understand what I've been saying and everybody's been saying here.

THE DEFENDANT: Yeah, I do understand.

THE COURT: And knowing all that, you still wish to give up those possible conflicts.

THE DEFENDANT: Yes.

Defense counsel then urged once more that he be allowed to withdraw. The court again denied the motion and questioned conflict advisement counsel as follows:

THE COURT: [Conflict advisement counsel], are you convinced in your mind that John understands the possible conflicts involved here and is aware of what he's doing?

[CONFLICT ADVISEMENT COUNSEL]: Yeah, I am. John—I talked with him. John impressed me as having an [sic] very good handle on this whole thing. He's a bright guy. I didn't—We went over everything. He asked me intelligent questions. He had intelligent observations to make. And I think he knows what he's doing. I think he's—as he has said, I think he's very satisfied with [defense counsel's] representation of him so far. I think he wants him to continue on his case for that reason, for that reason alone.

THE COURT: Okay.

[DEPUTY DISTRICT ATTORNEY]: Your Honor, if you would go over the defense attorney's motion to withdraw with the defendant, I'd appreciate that on the record.

The court then read to the defendant the motion to withdraw.[1]

The court next engaged in the following final colloquy with the defendant and counsel:

You basically understand that, John?

THE DEFENDANT: Yeah.

[DEPUTY DISTRICT ATTORNEY]: Is he waving [sic] those conflicts, Your Honor?

1. The record on appeal does not contain the written motion. As read to the defendant by the court, it consisted of twelve grounds and is set forth in the appendix to this opinion, together with the trial court's colloquies with the defendant elaborating on certain of the grounds. Nei-

ther the motion nor the explanations offered by the court provided the defendant with an adequate explanation "of the specific manner in which the conflict might affect his attorney's representation at various stages of the prosecution." *Castro,* 657 P.2d at 946.

THE COURT: Do you waive those conflicts?

THE DEFENDANT: You mean the conflict between the attorney?

THE COURT: Yes.

THE DEFENDANT: Yeah.

THE COURT: Okay.

[DEPUTY DISTRICT ATTORNEY]: Your Honor, I'd want that on the record, a reiteration that they are waiving the conflict as to Charlie Blea who is a witness in the case and a possible suspect. [Defense counsel] represented him and may continue to do so. Thank you.

THE COURT: Okay. Do you wish to waive that conflict also, John?

THE DEFENDANT: With Charlie Blea?

THE COURT: Yes. [Defense counsel] used to represent him.

THE DEFENDANT: What difference does that make he used to represent him, you know? He's a witness. What difference does it make? Where is the conflict there?

THE COURT: Different things could happen. But—I'd be guessing at it, but I think things could happen. You might think that [defense counsel's] loyalties are with Mr. Blea, and he'd be trying to protect Mr. Blea if he was to question him.

THE DEFENDANT: No. I don't think he's trying to protect Mr. Blea at all.

THE COURT: Okay. Anyway, there's potentials for conflict there that none of us could maybe foresee. Do you waive those conflicts as well?

THE DEFENDANT: Yeah.

THE COURT: Okay. Do you understand that by giving up these conflicts with [defense counsel] or that [defense counsel] has with this case that you're giving them up forever? Do you understand that?

THE DEFENDANT: Yeah.

THE COURT: Okay. And knowing all that we've stated here today, is that your—Is that what you want to do?

THE DEFENDANT: Yeah.

THE COURT: Okay. Is that an absolutely voluntary decision on your part?

THE DEFENDANT: Yes.

THE COURT: Nobody's making you do that.

THE DEFENDANT: No.

THE COURT: Nobody's forcing you in any way.

THE DEFENDANT: No.

THE COURT: Okay. And [Conflict Advisement Counsel], one more time. You're satisfied that he understands what's going on here and is voluntarily giving up these rights.

[CONFLICT ADVISEMENT COUNSEL]: *I didn't talk with him about Mr. Blea. I wasn't aware of that.* Except for that item, I discussed it all with him.

THE COURT: He had waived that, that conflict quite early on in the proceedings as I recall too. So—Okay.

(Emphasis added.)

In conclusion the court ruled as follows:

The Court finds that the defendant has voluntarily, knowingly, intelligently on the record waived any possible conflicts with his attorney, ... concerning possible—well, any and all possible conflicts at this time. Anything further?

### IV.

In my opinion the record does not reflect that the defendant was adequately advised of the several conflicts of interest faced by defense counsel in this case or that his waiver was knowing, voluntary, and intelligent. Although the discussions of the matter were extensive I cannot agree with the majority that they were "thorough" or "readily intelligible," see maj. op. at 527, that the conflicts "were fully explained to Martinez," or were "particularized, specific, and detailed," see maj. op. at 528. The record does not show that the defendant was advised of the nature of a grievance proceeding or the possible sanctions to which his counsel could be subjected if charges of professional misconduct were sustained. It does not reflect that the defendant was informed that an attempt to induce a subpoenaed witness not to appear at trial constitutes a crime. *See* § 18–8–707, 8B C.R.S. (1986). Accordingly, the record does

not demonstrate that the defendant understood the conflict between his counsel's obligation to conduct vigorous cross examination of Olguin and Harris on the defendant's behalf and defense counsel's interest in not antagonizing these witnesses, whose testimony would be central in possible grievance or criminal proceedings against him. Nor does the record indicate that the defendant understood that loss of the ability to cross examine Olguin and Harris about defense counsel's alleged statements to them and to impeach their testimony with that of defense counsel and with the prior inconsistent statement of one of the witnesses precluded evidence that might have cast the credibility of all of the testimony of these key witnesses into doubt. Although the defendant indicated that he did not wish to plea bargain, the full significance of the lost opportunity to do so because of the grievance proceeding the prosecutor intended to initiate against defense counsel was never explained to the defendant. Finally, the nature and extent of the divided loyalties posed by defense counsel's representation of a witness who was a possible alternative suspect were never adequately explained to the defendant. His responses to the court's questions on these matters reflect his lack of comprehension of the conflicts.[2] *See* generally *People v. Castro,* 657 P.2d 932, 945–46 (Colo.1983) (explaining importance of defendant's understanding of conflict to a finding of effective waiver); *Rodriguez v. District Court,* 719 P.2d 699 (Colo.1986) (explaining importance of proper advisement and judicial inquiry to support finding of voluntary, knowing, and intelligent waiver of conflicted counsel). Whether the off-the-record advisement by defense counsel or conflict advisement counsel served to repair these deficiencies cannot be determined. Only conclusory statements about the content of these advisements appear in the record. It is not clear

from these statements that the defendant was made "aware of the conflict and its likely effect on the attorney's ability to offer effective representation." *People v. Czemerynski,* 786 P.2d 1100, 1106 (Colo.1990); *Castro,* 657 P.2d at 946. Under these circumstances the prosecution has not met its burden of establishing voluntary, knowing, and intelligent waiver of the right to conflict free counsel.[3]

Although I agree with the majority that the defendant—and I would add, the court—was highly motivated to proceed promptly to trial, and though it is true that the defendant's wish to retain his present counsel should carry great weight even if his decision may be ill advised, *see, e.g., Castro,* 657 P.2d at 946 n. 10, no voluntary, knowing, and intelligent waiver is possible in the absence of an adequate advisement concerning the potential conflicts.

Under the circumstances, I believe the court of appeals acted within its discretion in remanding the case for a further hearing on the issue of waiver of conflict-free counsel.[4] Accordingly, I respectfully dissent from the majority opinion and would affirm the judgment of the Colorado Court of Appeals.

SCOTT, J., joins in this dissent.

*Appendix to Dissent*

*People v. Martinez,* No. 92SC564

Defense counsel's motion to withdraw, as read to the defendant by the court, followed by the court's explanation of certain parts of the motion, *see* note 1, *supra,* was as follows:

THE COURT: [G]round number one is that "Colorado Code of Professional Responsibility Disciplinary Rule 2–110 states that 'a lawyer representing a client before a tribunal shall withdraw from appoint-

---

2. It has been suggested that questions designed to elicit a narrative response from the defendant are preferable in attempting to determine whether a purported waiver of conflict-free counsel is voluntary, knowing, and intelligent. *Curcio,* 680 F.2d at 889.

3. This case presents an anomalous situation in that the prosecution was not attempting to bear the evidentiary burden. Instead, it vigorously supported defense counsel's motion to withdraw.

4. The court of appeals outlines a nonexclusive list of five questions the trial court should explore in order to determine whether defendant was adequately and specifically advised such that his waiver was thereafter voluntarily, knowingly, and intelligently made. *Martinez,* slip. op. at 7–8.

ment if he knows or it is obvious that his continued employment will result in a violation of a disciplinary rule.'

"In the present case, counsel's continued representation of defendant will result in a violation of several disciplinary rules detailed below."

Number two: "Colorado Code of Professional Responsibility states that 'a lawyer may withdraw if by other conduct rendered unreasonably difficult for the lawyer to carry out his employment effectively.' [Sic.]

"In this case because of the allegations that have been brought before the Court in a sealed hearing it would be unreasonably difficult for counsel to carry out his employment effectively."

Number three: "Colorado Code of Professional responsibility—I'm leaving out the specific citations, John—states that a lawyer may withdraw if, quote, 'his continued employment is likely to result in a violation of a Disciplinary Rule.'

"In the present case counsel's continuing representation in employment by this—by the state of defendant is likely to result in a violation of several Disciplinary Rules detailed below." [Sic.]

Number four: "Colorado Code of Professional Responsibility Disciplinary Rule states that a lawyer may withdraw if quote, 'he believes in good faith, in a proceeding pending before a tribunal, that the tribunal finds existence of other good cause for withdrawal.'

"In the present case because of the Court's ruling restricting questioning the absence of witnesses Olguin and Harris, other good cause for withdrawal is apparent."

Number five: "Colorado Code of Professional Responsibility Disciplinary rule states that 'a lawyer shall not continue multiple employment if the exercise of his independent professional judgment in behalf of the client will be or is likely to be adversely affected by his representation of another client, or if it would be likely to involve him in representing differing inter-ests except to the extent permitted under another rule.'

"Differing is defined by the Colorado Code of Professional Responsibility definitions section as, 'Differing interests include every interest that will adversely affect either the judgment or the loyalty of the lawyer to the client, whether it be a conflicting, inconsistent, diverse or other interest.

"In the present case the allegations lodged against counsel for defendant necessarily put counsel in the position of representing differing interests which are not permitted under DR 5–105(C)."

Number six: "Colorado Code of Professional Responsibility states that 'if, after undertaking an employment in contemplated or pending litigation, a lawyer learns or it is obvious that he or a lawyer in his firm ought to be called as a witness on behalf of his client, he shall withdraw from the conduct of the trial and his firm, if any, shall not continue representation in the trial, except that he may continue the representation and he or a lawyer in his firm may testify in the circumstances enumerated in a different rule.'

"In the present case, counsel in good faith believes he ought to be called as a witness on behalf of his client, thus mandating withdrawal from further representation of client."

. . . . .

THE COURT: Okay. Number 7: "Colorado Code of Professional Responsibility, Ethical Consideration 5–1 states that 'the professional judgment of a lawyer should be exercised within the bounds of the law, soley [sic] for the benefit of his client and free of compromising influences and loyalties. Neither his personal interests, the interests of other clients, nor the desires of a third person should be permitted to dilute his loyalties to his client.'

"In the present case, counsel feels that it would be in the best interest of Mr. Martinez if counsel testify as [to] the credibility of witnesses Olguin and Harris. Additionally, counsel feels that the interview conducted by the district attorney's office

on January 29th, 1988 is incomplete and misleading.

"Additionally, it has been brought to counsel's attention that a grievance is to be filed against [defense counsel] which would necessarily make counsel's representation of Mr. Martinez not free of compromising influences and loyalties."

. . . . .

THE COURT: Okay. Number eight: "Colorado Code of Professional Responsibility states that, quote, 'a lawyer should not accept proffered employment if his personal interests or desires will, or there is a reasonable probability that they will, affect adversely the advice to be given and services to be rendered to the prospective client[.]'

"In the case at bar, because of the disciplinary action to be filed against counsel, there is a reasonable probability that the counsel's advice could be seen as being adversely affected by counsel's own position with regards to the disciplinary action."

Number nine: "Colorado Code of Professional Responsibility Canon 9 states that 'a lawyer shall avoid even the appearance of professional impropriety.'

"In the present case, it is obvious that the events outlined above create an appearance of impropriety if counsel is to be continued—is to continue in the representation of Mr. Martinez."

Number ten: "Colorado Code of Professional Responsibility Ethical Consideration 5–9 states, quote, 'an advocate who becomes a witness is in the unseemly and ineffective position of arguing his own credibility. The roles of an advocate and of a witness are inconsistent; the function of an advocate is to advance or argue the cause of another, while that of the witness is to state the facts objectively.'

"In the present case, counsel would be in the 'unseemly and ineffective position of arguing his own credibility.'"

. . . . .

Number eleven: "Colorado Code of Professional Responsibility Ethical Consideration 5–10 states that, " 'where the question arises, doubts should be resolved in favor of the lawyer testifying and against his becoming or continuing as an advocate.' "

Twelve: "If this motion is granted, counsel will take reasonable steps to avoid foreseeable prejudice to the rights of the defendant including giving the defendant due notice, in time for employment of other counsel, handing over to the defendant all papers and property to which the defendant is entitled, and complying with all applicable laws and rules."

You basically understand that, John?

THE DEFENDANT: Yeah.

The following exchange took place after the reading of ground 6:

THE COURT: I'll stop there for a second. Do you understand, John, that if I allow the question of why Miss Olguin and Mr. Harris didn't show up, and they said because [defense counsel] told them not to, then he would have to take the stand and testify? And if we allow him to stay on the case, he wouldn't be able to do that, to say that, no, they're lying. Do you understand that?

THE DEFENDANT: Why wouldn't he be able to do that?

THE COURT: Because he'd have to withdraw at that time, okay?

THE DEFENDANT: So you're saying their word is—

THE COURT: No. I'm not going to allow them to get into that. That is what my ruling has been. I'm not going to allow them to say—Nobody's going to be able to say anything about what [defense counsel] said.

[CONFLICT ADVISEMENT COUNSEL]: Your Honor, I'd just like to interject here that my discussion with Mr. Martinez was based on the fact that that would not be so, that [defense counsel] wouldn't be faced with not being able to take the stand.

THE COURT: Okay. So I've entered a rule that would make that not happen, okay?

THE DEFENDANT: Yeah.

THE COURT: He wouldn't have to take the stand. Under the rule I entered, Mr. and Mrs. Olguin—Miss Olguin and Mr. Harris wouldn't be able to say that [defense counsel] told us not to show up, okay?

THE DEFENDANT: Huh-huh.

After the reading of ground 7, the following question was asked and answer given:

THE COURT: Do you understand that a different—I'm going to stop here a second. But do you understand, John, that a different attorney would be able to possibly question witnesses regarding—or [defense counsel] regarding why they didn't show up?

THE DEFENDANT: Yeah.

After reading ground 10, the court elaborated:

THE COURT: Again I'm not going to— If [defense counsel] represents you, I'm not going to allow him to take the stand to testify, okay?

