21CA1741 Peo v Erickson 11-14-2024

COLORADO COURT OF APPEALS

---

Court of Appeals No. 21CA1741
Douglas County District Court No. 19CR451
Honorable Theresa Slade, Judge

---

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Devon Michael Erickson,

Defendant-Appellant.

---

JUDGMENT AFFIRMED IN PART, VACATED IN PART, REVERSED IN PART,
AND CASE REMANDED WITH DIRECTIONS

Division II
Opinion by JUDGE FOX
Johnson and Schock, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced November 14, 2024

---

Philip J. Weiser, Attorney General, Trina K. Kissel, Senior Assistant Attorney
General & Assistant Solicitor General, Denver, Colorado, for Plaintiff-Appellee

Eric A. Samler, Alternate Defense Counsel, Hollis A. Whitson, Alternate
Defense Counsel, Denver, Colorado, for Defendant-Appellant

¶ 1    Defendant, Devon Michael Erickson, appeals the judgment of conviction entered on a jury verdict finding him guilty of forty-six counts including, as relevant here: one count of first degree murder after deliberation; one count of first degree extreme indifference murder (EIM); one count of conspiracy to commit first degree murder after deliberation; six counts of attempted first degree murder after deliberation; twenty-five counts of attempted first degree extreme indifference murder (AEIM); and twelve counts unrelated to murder or attempted murder.  We affirm in part, vacate the conviction as to count 31, and reverse and remand in part to the district court with instructions to merge the sentences and convictions for counts 1 and 2, 4 and 10, 5 and 20, 6 and 21, 8 and 16, and 9 and 25.

## I.    Background

¶ 2    On May 7, 2019, Erickson — then eighteen years old and a senior at STEM School Highlands Ranch — and a fellow student, A.M., entered Erickson's English classroom, room 107, with guns and started shooting.  A.M. fired nine shots and Erickson fired four.  Classmate K.C. was fatally shot after tackling Erickson, and five

students suffered gunshot wounds: J.J., J.G., M.K., G.M.O., and L.A.

¶ 3      On the day of the shooting, police interviewed A.M. and Erickson. Erickson told police that A.M. forced him to do cocaine and then participate in the shooting. Originally, A.M.'s version of events matched Erickson's. However, A.M. testified at Erickson's trial that he had lied in his police interview; they had in fact planned the shooting for several weeks, and their original plan was to have Erickson shoot A.M., who was suicidal, and then blame A.M. for the shooting.

¶ 4      Erickson was ultimately charged as noted above. A.M. pleaded guilty to multiple counts before Erickson's trial. A.M., who was sixteen years old at the time of the shooting, received a life sentence with the possibility of parole.

¶ 5      Judge Theresa Slade presided over Erickson's trial and was initially assigned to A.M.'s case. However, having previously represented A.M.'s mother, M.M., in a dependency and neglect (D&N) case, she recused from A.M.'s case. Erickson then moved to recuse Judge Slade from his case. The court denied his motion for recusal, which Erickson twice renewed. The court denied both

renewed motions. Erickson then filed a C.A.R. 21 petition in the Colorado Supreme Court concerning Judge Slade's non-recusal; the supreme court similarly denied it. Judge Slade presided over Erickson's case.

¶ 6 At trial, the State argued that A.M.'s trial testimony, not his or Erickson's police interviews, reflected the actual events. Specifically, the State argued that Erickson and A.M. had planned the shooting for weeks, Erickson was a voluntary participant, and the two fabricated evidence to advance a narrative that A.M. coerced Erickson. Conversely, Erickson argued, claiming duress, that A.M. forced him to ingest cocaine and participate in the shooting.

¶ 7 The jury found Erickson guilty of all forty-six counts. He received two concurrent life sentences without the possibility of parole for the first degree murder convictions and various sentences for the remaining convictions. Erickson now appeals.

¶ 8 On appeal, Erickson renews his argument that Judge Slade erred by failing to recuse. Additionally, he argues that, because AEIM is not a cognizable offense, Erickson's AEIM convictions violated his due process rights. In the alternative, Erickson raises an as-applied equal protection challenge to his AEIM convictions.

3

Next, he argues that the district court erred by refusing to give the jury an involuntary intoxication instruction on counts 3-46. Similarly, he asserts that the court erred by refusing to give a duress instruction on counts 3-34, 36-39, and 42-45.[1]  Erickson also asks us to vacate his conviction for count 31, arguing that there was insufficient evidence to support a conviction for attempted murder of R.W., a classmate.  Finally, Erickson contends that the district court erred by entering two first degree murder convictions and sentences for the same victim and two attempted first degree murder convictions and sentences for each of five victims.

## II.     The Judge's Non-Recusal Does Not Require Reversal

### A.     Standard of Review and Applicable Law

We review de novo whether a district court judge's recusal was required.  *People v. Garcia*, 2024 CO 41M, ¶ 20.  Several bodies of law govern a judge's duty to recuse.  First, the Fourteenth Amendment's Due Process Clause requires recusal when the

---

[1]  The court gave a duress instruction for counts 35, 40, 41 and 46, and Erickson concedes that he was not entitled to a duress instruction for first degree murder — counts 1 and 2.

objective "*probability* of actual bias . . . is too high to be constitutionally tolerable." *Sanders v. People*, 2024 CO 33, ¶ 29 (quoting *Rippo v. Baker*, 580 U.S. 285, 287 (2017)). This occurs when a judge has "a direct, personal, substantial, [or] pecuniary interest" in the case. *Id.* at ¶ 27 (quoting *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 876 (2009)).

¶ 10 Second, section 16-6-201(1)(d), C.R.S. 2024, and Crim. P. 21(b)(1)(IV) provide that a judge must recuse when she "is in any way interested or prejudiced with respect to the case, the parties, or counsel." However, a mere showing of "possible or arguable bias or prejudice" is insufficient; there must be a reasonable inference that the judge cannot deal fairly with a party. *Sanders*, ¶ 41. This requires "a direct, certain, and immediate interest, and not one which is indirect, contingent, incidental, or remote." *Id.* (citation omitted).

¶ 11 Third, our supreme court has interpreted Code of Judicial Conduct Rule 2.11(A) as requiring recusal if a judge is actually biased or if there is an "appearance of partiality." *Sanders*, ¶ 45. If a judge has personal knowledge of disputed facts or "served as a lawyer in the matter in controversy," C.J.C. 2.11(A)(1), (5)(a), we

5

may find an appearance of partiality, *Sanders*, ¶ 45. While evidence of actual bias is not necessary to support a disqualification motion, reversal is only appropriate under this rule if the judge was actually biased. *Sanders*, ¶¶ 2, 30, 50 (citation omitted).

¶ 12 Finally, a party seeking a judge's disqualification must allege concrete facts; "conclusory statements, conjecture, and innuendo do not suffice." *Black v. Black*, 2020 COA 64M, ¶ 117 (quoting *Zoline v. Telluride Lodge Ass'n*, 732 P.2d 635, 639 (Colo. 1987)). A reversal based on bias or prejudice requires "more than mere speculation concerning the possibility of prejudice." *People v. Schupper*, 2014 COA 80M, ¶ 59 (quoting *People v. Coria*, 937 P.2d 386, 391 (Colo. 1997)).

## B. Analysis

¶ 13 Erickson argues that the above principles required Judge Slade's recusal from his case and warrant reversal on appeal. Without citing to specific portions of the record to support his argument, Erickson contends that because Judge Slade represented A.M.'s mother in a D&N case more than a decade before Erickson's trial, she had "information about [A.M.] she would not otherwise have been exposed to." Erickson further alleges that

6

Judge Slade *may* have had "information . . . about [A.M.'s] behavior, culpability, and credibility." Finally, Erickson argues that Judge Slade's decision to recuse from A.M.'s case likewise required her recusal in Erickson's case. We disagree and conclude that these conclusory speculations are legally insufficient. We reach this determination for two reasons.

¶ 14 First, there is no allegation, let alone evidence, that Judge Slade had any direct, concrete interest in Erickson's case. *See Sanders*, ¶¶ 27, 41. The fact that she possibly had some dated familiarity with A.M. from the D&N case is insufficient to show that she would be unable to deal fairly with *Erickson* in his trial. *See id.* at ¶ 41. Although Erickson relies heavily on the judicial code's caution against an appearance of partiality, he points to no actual, specific bias sufficient to warrant reversal. *See id.* at ¶ 50. Judge Slade had no prior interaction with Erickson. Additionally, Erickson does not allege any disputed facts in his case that Judge Slade obtained when representing A.M.'s mother. *See* C.J.C. 2.11(A)(1). The D&N case occurred a decade-plus before A.M. and Erickson met.

¶ 15    Our cases require more than alleged here to support a judge's disqualification.  In one case, the mere fact that a judge presiding over a case had formerly prosecuted a defendant on similar charges was insufficient to create an appearance of partiality requiring recusal.  *People v. Flockhart*, 2013 CO 42, ¶¶ 43, 46, 54.  While the cases were similar, the court reasoned that they were not materially related, seven years had elapsed between them, and nothing from the earlier case was relevant to the later case.  *Id.* at ¶¶ 53-54.  Here, the claimed connection between the proceedings is even more attenuated.  Judge Slade's prior representation did not concern the same parties or subject matter as Erickson's case.  Like *Flockhart*, the two cases were not related, occurred years apart, and any facts from the D&N case were irrelevant to Erickson's trial.

¶ 16    Second, Erickson relies on a case in which a division of this court held that Judge Slade's involvement as guardian ad litem in a case involving a mother's older child required her recusal from a D&N case concerning the mother's younger children.  *People in Interest of C.Y.*, 2018 COA 50, ¶¶ 10, 24.  Finding an impermissible appearance of partiality, the court described the earlier case as "highly relevant during this termination proceeding" in part because

8

the judge was statutorily required to consider it. *Id.* at ¶¶ 18, 20-24 (noting that the judge also took a position adverse to the mother in the first proceeding).

¶ 17    Not so, here. A.M.'s mother was neither a party nor a witness in Erickson's case. And Erickson has not identified any specific information Judge Slade could have obtained about A.M. in the course of representing the mother that would have been relevant to the charges against Erickson. Moreover, nothing in the record suggests that the D&N case caused Judge Slade to harbor any bias against A.M. or Erickson. In short, because Erickson's concerns about Judge Slade's partiality were "purely speculative" and lacked any suggestion of actual bias, Judge Slade did not err by refusing to recuse. *Schupper,* ¶ 59.

### III.    AEIM is a Cognizable Colorado Offense

¶ 18    Erickson asks us to depart from established precedent holding that AEIM[2] is a cognizable offense. Erickson initially stated that

---

[2] Attempted extreme indifference murder (AEIM) is derived from section 18-3-102(1)(d), C.R.S. 2024, extreme indifference murder (EIM), and section 18-2-101(1), C.R.S. 2024, criminal attempt.

this issue was unpreserved, but the State points to various parts of the record where Erickson preserved this argument.

¶ 19     We review questions of law de novo. *Washington v. People*, 2024 CO 26, ¶ 14, and our "[supreme court] alone can overrule [its] prior precedents concerning matters of state law," *People v. Novotny*, 2014 CO 18, ¶ 26. Our supreme court has explicitly held that AEIM is a cognizable crime under Colorado law. *People v. Castro*, 657 P.2d 932, 937-38 (Colo. 1983), *overruled in part on other grounds by West v. People*, 2015 CO 5. *Castro*'s validity is not in question. *See, e.g., Montoya v. People*, 2017 CO 40, ¶ 17 & n.3 (affirming AEIM's validity under section 18-3-102(1)(d), C.R.S. 2024's current language); *People v. Anderson*, 2019 CO 34, ¶¶ 17-18 (discussing AEIM's elements). Because we are bound by controlling precedent, *Novotny*, ¶ 26, we reject Erickson's invitation to depart from *Castro*.

IV.    The Unpreserved As-Applied Constitutional Challenge Fails

¶ 20     Alternatively, Erickson raises an unpreserved as-applied equal protection challenge to his AEIM convictions for individuals neither shot at nor injured. Specifically, he contends that these convictions cannot stand because AEI*M* and attempted first degree extreme

10

indifference *assault* (AEI*A*) proscribe the same conduct with vastly different penalties.  Because we conclude that the two crimes do not proscribe identical conduct and thus do not violate equal protection, we affirm Erickson's AEIM convictions.

### A.  Preservation and Standard of Review

¶ 21    We generally do not consider unpreserved as-applied challenges because a factual record is typically imperative.  *See People v. Stone*, 2020 COA 23, ¶ 49 (citation omitted).  However, we may exercise our discretion to consider such claims "where doing so would clearly further judicial economy" or when the factual record is sufficient to facilitate our review.  *People v. Price*, 2023 COA 96, ¶ 47 (citation omitted).

¶ 22    In *Price*, a division of this court exercised its discretion to consider an unpreserved as-applied equal protection challenge where the defendant argued that one statute prohibited "essentially the same conduct as [another] statute but carrie[d] a much higher sentence."  *Id.* at ¶¶ 46-47 (finding a sufficient factual record).  Erickson raises a nearly identical challenge, which we similarly exercise our discretion to address.  "We review de novo whether two statutes prohibit the same or different conduct."  *Id.* at ¶ 47.  We

11

reverse unpreserved constitutional errors only upon a finding of plain error. *Id.* (citing *Hagos v. People*, 2012 CO 63, ¶ 14).

## B.    Applicable Law

¶ 23    Under our state constitution, "equal protection is violated where two criminal statutes proscribe identical conduct, yet one punishes that conduct more harshly." *Dean v. People*, 2016 CO 14, ¶ 14. We look to each statute's elements to determine whether they proscribe identical conduct. *People v. Curtis*, 2021 COA 103, ¶ 31. There is no equal protection violation when "one statute requires proof of an element that the other does not." *Id.* (citation omitted).

¶ 24    While the General Assembly may prescribe harsher penalties for conduct that it views as more reprehensible, such differences must be rationally justified, *Dean*, ¶ 16, and distinguishable by "a person of average intelligence," *People v. Griego*, 2018 CO 5, ¶ 36 (citation omitted).

## C.    Analysis

¶ 25    A person commits EI*M* when, "[u]nder circumstances *evidencing an attitude of universal malice* manifesting extreme indifference to the value of human life *generally*, [one] knowingly engages in conduct which creates a grave risk of death to a person,

12

or persons, other than himself, and thereby *causes the death of another.*" § 18-3-102(1)(d) (emphasis added).  EIA occurs when, "[u]nder circumstances manifesting extreme indifference to the value of human life, [one] knowingly engages in conduct which creates a grave risk of death to another person, and thereby causes serious bodily injury to any person." § 18-3-202(1)(c), C.R.S. 2024.  Erickson argues that, because the only difference between the two statutes is the result, the attempted offenses are identical.  For three reasons, we are not persuaded: (1) unlike AEIA, AEIM requires a finding of universal malice; (2) AEIM requires a substantial step towards causing death, while AEIA requires a substantial step towards causing bodily injury; and (3) there is a rational justification for more harshly punishing conduct that satisfies those two elements.

¶ 26    First, a division of this court has held that EIM's "universal malice" requirement distinguishes it from EIA.  *People v. Baker*, 178 P.3d 1225, 1229-30 (Colo. App. 2007) (concluding that universal malice is not a required finding for an EIA conviction).  Universal malice is "conduct 'evidenc[ing] a willingness to take human life indiscriminately, without knowing or caring who the victim may be

13

or without having an understandable motive or provocation.'" *Garcia v. People*, 2023 CO 30, ¶ 16 (alteration in original) (citation omitted). Erickson contends that this definition is indistinguishable from "circumstances manifesting an extreme indifference to human life." § 18-3-202(1)(c). Not so.

¶ 27 *Baker*'s holding undermines this argument as does the fact that "we will not interpret a statutory provision in a way that renders any of its words or phrases meaningless." *People v. Warren*, 2024 COA 60, ¶ 20. EIM requires universal malice and "extreme indifference to human life." § 18-3-102(1)(d). If the phrases have identical meanings, one necessarily becomes meaningless. Furthermore, criminal attempt requires "acting with the kind of culpability otherwise required for commission of an offense." § 18-2-101(1), C.R.S. 2024. Therefore, one must act with universal malice and extreme indifference to commit AEIM, while AEIA requires only extreme indifference. *See Baker*, 178 P.3d at 1229-30.

¶ 28 Second, our supreme court has distinguished AEIM from AEIA on an additional ground; namely, that AEIM requires a substantial

step towards causing death, while AEIA does not.[3] *See Castro*, 657 P.2d at 940-41 (concluding that completed EIA and AEIM are sufficiently different so as not to violate equal protection). Erickson distinguishes *Castro* by arguing that the court did not consider two attempted offenses, and the "heightened risk of death to the victim" that distinguishes the attempted murder offense (AEIM) from the completed assault (EIA) is not present when victims are neither shot at nor injured. *Id.* at 941. We disagree.

¶ 29    Erickson asserts that *Castro*'s reasoning depended on the fact that the defendant's act would have resulted in death if the victim, who was shot, had not survived. First, this part of *Castro* dealt with the sufficiency of evidence to uphold an AEIM conviction, not the equal protection claim. *See id.* Second, we do not read *Castro* as holding that a heightened risk of death requires injury. The court specifically described the defendant's conduct as "manifest[ing] extreme indifference towards the lives of the victim . . . *and of those*

---

[3] *People v. Castro*, 657 P.2d 932, 940-41 (Colo. 1983), *overruled in part on other grounds by West v. People*, 2015 CO 5, primarily compared AEIM with completed EIA but alluded to both attempted offenses when it described AEIM as requiring a substantial step towards causing death, while "assault in the first degree . . . does not require . . . a substantial step towards" causing another's death.

15

*in the immediate vicinity*" and that firing a gun "in the general direction of the victim *and other persons*" created a grave risk of death. *Id.* (emphasis added). Therefore, while the conviction there related only to the injured victim, *Castro* did not foreclose the possibility of an AEIM conviction for uninjured victims.

¶ 30 Finally, there is a rational justification, readily apparent to those of average intelligence, for punishing conduct committed with universal malice and constituting a substantial step toward causing death more harshly than conduct that does not. *See Griego*, ¶ 36.

¶ 31 In short, because there is a rational basis for AEIM's heightened penalty and because AEIM "requires proof of . . . element[s] that [AEIA] does not," we conclude that Erickson's AEIM convictions do not violate equal protection as applied to him. *Curtis*, ¶ 31.

## V. The District Court Did Not Err by Refusing to Give an Involuntary Intoxication Instruction

### A. Additional Facts

¶ 32 Defense counsel originally asked for a jury instruction on involuntary intoxication for all counts. This instruction was based on Erickson's theory that A.M. forced him, at gunpoint, to ingest

cocaine. After a somewhat lengthy discussion, the district court ultimately refused to give the instruction because there was no evidence that Erickson (1) did not knowingly ingest an intoxicant, or (2) did not know the substance at issue was an intoxicant. Although the court denied the involuntary intoxication instruction, Erickson received a voluntary intoxication instruction for counts 1, 3-9, 37-39, and 42-46.

¶ 33     On appeal, Erickson argues that he presented evidence of involuntary intoxication, and the district court therefore erred by failing to allow the instruction under section 18-1-804(5), C.R.S. 2024, which provides an exception to voluntary intoxication if a defendant's intoxication stems from "circumstances that would afford a defense" to a charged crime. He does not direct us to exactly where in the record he presented evidence of involuntary intoxication. However, when cross-examining A.M., defense counsel focused briefly on A.M.'s initial statements to police that, on the day of the shooting, he forced Erickson to consume cocaine.

## B.     Standard of Review

¶ 34     We review de novo whether a defendant met the burden of presenting "some credible evidence" to support an affirmative

17

defense instruction. *Pearson v. People*, 2022 CO 4, ¶ 16 (citations omitted). If the district court erroneously refused to give an affirmative defense instruction, we review for constitutional harmless error. *Id.* Under this standard, we reverse "unless the error was harmless beyond a reasonable doubt." *Id.*

### C. Applicable Law

¶ 35 Generally, there are two types of defenses that criminal defendants may raise. First, affirmative defenses "seek to justify or mitigate the entire crime," not just a single element of the offense. *People v. Miller*, 113 P.3d 743, 750 (Colo. 2005). Second, traverse defenses "negate[] one or more elements of the offense, serving to undermine or cast doubt on the possibility that a defendant committed the charged offense." *Pearson*, ¶ 19. Involuntary intoxication is an affirmative defense. *Miller*, 113 P.3d at 750. Voluntary intoxication, by contrast, is not an affirmative defense because it seeks to negate evidence of specific intent. *Id.*; *see also* § 18-1-804(1).

¶ 36 Colorado appellate courts have broadly determined that defendants cannot assert a traverse defense and an affirmative defense for the same crime. *E.g., Pearson*, ¶ 19 (citations omitted).

Our cases have not explicitly decided whether this rule applies when a defendant seeks voluntary and involuntary intoxication instructions for the same offenses. *See Miller*, 113 P.3d at 750-52 (noting that both instructions were given but considering only the disputed voluntary intoxication instruction). However, we need not decide that issue here for the reasons set forth below.

### D.    Analysis

¶ 37    It is unclear whether Erickson asserts error in the court's refusal to give an involuntary intoxication instruction instead of — or in addition to — the voluntary intoxication instruction. Regardless, even if the district court found Erickson's evidence of involuntary intoxication credible — and even if Erickson could seek both instructions for the same counts — the court did not err by refusing to give the proffered involuntary intoxication instruction because it had no basis upon which to conclude that the jury could differentiate Erickson's voluntary intoxication from his involuntary intoxication. *See Pearson*, ¶ 16.

¶ 38    Regarding section 18-1-804(5), no Colorado appellate court has interpreted whether involuntary intoxication "under circumstances that would afford a defense to a charge of crime"

19

includes intoxication by force or duress. Erickson cites *People v. Mion*, 2023 COA 110M, ¶¶ 32-22, (*cert. granted* Aug. 19, 2024), to support his argument that coerced intoxication is a cognizable form of involuntary intoxication. We are not persuaded. *Mion* involved a defendant who voluntarily ingested what he believed was solely marijuana and later sought an "innocent mistake" involuntary intoxication instruction after suggesting that the marijuana *may* have been laced with another substance. *Id.* at ¶¶ 12, 16-19, 26, 34. Here, Erickson argues that A.M. forced him to ingest cocaine. Thus, unlike *Mion*, this issue is not "*what substance* caused the intoxication" but what circumstances caused the intoxication. *Id.* at ¶ 31.

¶ 39    However, we need not decide whether coerced intoxication is a cognizable defense under section 18-1-804(5) because the evidence presented at trial was insufficient to distinguish the effects of Erickson's voluntary drug use on May 7 from his alleged involuntary cocaine use. Entitlement to an involuntary intoxication defense requires proof that the involuntary intoxication resulted in the defendant "lack[ing] capacity to conform his conduct to the requirements of the law." § 18-1-804(3). Here, because there was

insufficient evidence to conclude that Erickson's involuntary intoxication — alone — met this standard, the court's decision to refuse the involuntary intoxication instruction was not erroneous. That Erickson simultaneously argued A.M. forced him to use cocaine and that his long-term cocaine use impacted his conduct also weighs against finding error. *See People v. Brown*, 218 P.3d 733, 737 (Colo. App. 2009), *aff'd*, 239 P.3d 764 (Colo. 2010) (citing *People v. Garcia*, 826 P.2d 1259 (Colo. 1992), for the proposition that "a defendant is not entitled to a theory of defense instruction inconsistent with his own principal theory").

¶ 40 There was evidence that Erickson ingested drugs at least three separate times on May 7. First, A.M. testified that he and Erickson did cocaine around 7:00 a.m. Erickson does not appear to argue that this was involuntary. Second, D.S. testified that he and Erickson did cocaine and smoked marijuana between 8:00 a.m. and 10:00 a.m. Third, A.M. testified that he and Erickson did cocaine multiple times between 11:00 a.m. and approximately 12:45 p.m. The latter instance is the cocaine use that Erickson claimed was involuntary. Finally, a defense expert testified that Erickon had a

long history of drug use and "used marijuana, cocaine, and cough medicine up until the day he was arrested."

¶ 41 The defense expert testified about cocaine's half-life, estimating that the drug leaves a person's system in approximately five hours depending on the amount consumed. However, the expert did not clarify the half-life for specific amounts and admitted that Erickson tested positive for cocaine more than five hours after his last use. Additionally, she noted that a person may feel cocaine's effects even after it leaves the bloodstream. The expert also did not testify in depth about the half-lives or effects of marijuana and cough medicine or how these substances interact with cocaine. Therefore, even if the court gave an involuntary intoxication instruction on some counts, the jury would have been unable to determine which "episode" of intoxication — voluntary or involuntary — potentially negated Erickson's culpability.[4]

---

[4] This analysis applies equally to counts for which Erickson sought only an involuntary intoxication instruction and those for which he may have sought both voluntary and involuntary intoxication instructions. Even if the court had given the involuntary intoxication instruction on different counts from which it gave a voluntary intoxication instruction, the jury still could not have considered each type of intoxication in isolation because of the potential overlap between the effects of each.

¶ 42     On this record, we affirm the district court's order refusing an involuntary intoxication instruction. *See Pearson*, ¶ 16.

### VI.    Any Error in the District Court's Refusal to Give a Duress Instruction Was Harmless Beyond a Reasonable Doubt

¶ 43     Erickson similarly challenges the district court's refusal to give a duress instruction. Erickson acknowledges that he was not entitled to a duress instruction for first degree murder (counts 1 and 2), and he received a duress instruction on counts 35, 40, 41, and 46. Therefore, he contends that the court erroneously denied the instruction as to the remaining counts (except counts 1 and 2). We disagree.

### A.    Standard of Review and Applicable Law

¶ 44     Duress, like involuntary intoxication, is an affirmative defense. *See* § 18-1-708, C.R.S. 2024 (defining duress); § 18-1-710, C.R.S. 2024 (describing sections 18-1-701 to -709, C.R.S. 2024, as affirmative defenses). As discussed above, a defendant must present "some credible evidence" to support an affirmative defense instruction, which we review de novo. *Pearson*, ¶ 16. We review erroneous denials of affirmative defense instructions for constitutional harmless error and reverse "unless the error was

harmless beyond a reasonable doubt." *Id.* An error is not harmless beyond a reasonable doubt and requires reversal when "there is a reasonable possibility that [it] might have contributed to the conviction." *Hagos,* ¶ 11.

### B. Analysis

¶ 45 We conclude that, even if the court erred in refusing to give a duress instruction, the error was harmless beyond a reasonable doubt.

¶ 46 First, because the jury found Erickson guilty of all counts, it clearly rejected the duress instruction given for several counts. Because this instruction was given, the prosecution carried the burden of disproving the duress defense for some counts. *Cf. People v. Coahran,* 2019 COA 6, ¶ 38 (failing to give a self-defense instruction eliminated the burden of disproving self-defense). We have no reason to believe the jury would have accepted the defense had it applied to more counts. *Cf. People v. DeGreat,* 2018 CO 83, ¶¶ 33-34 (refusing a self-defense instruction on one count that resulted in a conviction was not harmless when the defendant was acquitted of other counts for which the instruction was given).

¶ 47     The evidence negating duress was significant.  Duress requires

proof that the defendant engaged in conduct because of force or

threatened force that "a reasonable person in his situation would

have been unable to resist."  § 18-1-708.  Yet the evidence showed

that, once inside the school, Erickson had several opportunities to

safely warn others of the threat, outside of A.M.'s presence.

Erickson was also the first to pull out a gun and begin shooting.

Even if Erickson felt peer pressure from A.M., the jury had ample

evidence to conclude that such pressure did not rise to the level

required for duress.

¶ 48     From these facts, we cannot say there was a reasonable

possibility that giving a duress instruction on additional counts

would have yielded a different result.  *See Hagos*, ¶ 11.  Therefore,

any error in rejecting the duress instruction was harmless beyond a

reasonable doubt and does not require reversal.  *Id.*

### VII.   There Was Insufficient Evidence to Support Erickson's Conviction on Count 31

¶ 49     Erickson next contends that there was insufficient evidence to

support his conviction for AEIM of R.W., a student allegedly in the

25

classroom at the time of the shooting. We agree and vacate Erickson's conviction for count 31.

### A. Standard of Review and Applicable Law

¶ 50 Even when unpreserved, we review sufficiency of the evidence claims de novo and will not uphold convictions based on legally insufficient evidence. *McCoy v. People*, 2019 CO 44, ¶¶ 2, 27. Considering the evidence "as a whole and in the light most favorable to the prosecution," we ask whether it is "substantial and sufficient to support a conclusion by a reasonable mind that the defendant is guilty . . . beyond a reasonable doubt." *People v. Harrison*, 2020 CO 57, ¶ 32 (citation omitted). While we "give the prosecution the benefit of all reasonable inferences that might fairly be drawn from the evidence," convictions cannot be based on "guessing, speculation, conjecture, or a mere modicum of relevant evidence." *People v. Donald*, 2020 CO 24, ¶ 19 (citation omitted).

### B. Analysis

¶ 51 At trial, Laura Harper, the teacher in whose classroom the shooting occurred, testified about where each student in the class usually sat and, for some students, whether they were present on May 7. The only evidence of R.W.'s presence was Harper's

testimony that "[he] usually sat somewhere in the middle." Because this evidence could not establish R.W.'s presence beyond a reasonable doubt, it is legally insufficient to support Erickson's conviction for the attempted murder of R.W.

¶ 52    The State argues that the jury could infer R.W.'s presence from Harper's testimony because the prosecution asked her to confirm whether students were absent on May 7, and her testimony about R.W. was consistent with her testimony about other students. However, as the prosecution listed names, Harper focused more on where students sat than their attendance. Only when prompted did she indicate whether she remembered students being present.

¶ 53    Of the twenty-five names listed, Harper did not explicitly confirm whether fourteen students were present. Of these fourteen students, eleven testified. Only three of the fourteen students, R.W., K.M., and N.W., did not testify. However, other witnesses' testimony confirmed K.M.'s and N.W.'s presence on May 7. No witness, other than Harper, mentioned R.W. or testified about his presence. Therefore, while Harper's testimony about R.W. was consistent with her testimony about other students, the evidence

27

about R.W. was substantially weaker than that of other students. *See Harrison*, ¶ 32. Because Erickson's conviction for count 31 was supported by little more than speculation, it cannot stand. *See Donald*, ¶ 19.

### VIII. The District Court Erred by Failing to Merge Two Murder Counts for the Same Victim and Two Attempted Murder Counts for the Same Five Victims

¶ 54    Erickson next raises an unpreserved argument that several of his convictions and sentences violate double jeopardy and must merge. The State agrees that merger is the proper remedy. The counts, convictions, and sentences at issue are as follows:

| Victim | Conviction and Sentence | Conviction and Sentence |
|---|---|---|
| K.C. | First degree murder, after deliberation (AD): count 1 | First degree murder, extreme indifference (EI): count 2 |
| | Life without parole, concurrent to count 2 | Life without parole, concurrent to count 1 |
| L.A. | Attempted first degree murder, AD: count 4 | Attempted first degree murder, EI: count 10 |
| | 48 years, consecutive to counts 1-3 | 48 years, concurrent to count 4, consecutive to all others |
| J.J. | Attempted first degree murder, AD: count 5 | Attempted first degree murder, EI: count 20 |
| | 48 years, consecutive to counts 1-4 | 48 years, consecutive to all others |
| M.K. | Attempted first degree murder, AD: count 6 | Attempted first degree murder, EI: count 21 |
| | 48 years, consecutive to counts 1-5 | 48 years, consecutive to all others |

| Victim | Conviction and Sentence | Conviction and Sentence |
|--------|------------------------|------------------------|
| J.G. | Attempted first degree murder, AD: count 8 | Attempted first degree murder, EI: count 16 |
| | 48 years, consecutive to counts 1-7 | 48 years, consecutive to all others |
| G.M.O. | Attempted first degree murder, AD: count 9 | Attempted first degree murder, EI: count 25 |
| | 48 years, consecutive to counts 1-8 | 48 years, consecutive to all others |

## A.    Standard of Review

¶ 55    We review de novo whether merger of multiple criminal offenses is required. *People v. Thompson*, 2018 COA 83, ¶ 39. Under the Double Jeopardy Clauses of the United States and Colorado Constitutions, absent express statutory authorization, identical criminal conduct cannot be subject to multiple punishments under different statutes. *Id.* at ¶ 40 (citations omitted). If a district court erroneously "entered multiplicitous punishments in violation of double jeopardy principles, merger is the remedy." *Whiteaker v. People*, 2024 CO 25, ¶¶ 22-24.

## B.    Applicable Law and Analysis

¶ 56    Under our criminal code, first degree murder is a single offense, "which can be committed in four different ways," rather than four distinct offenses. *Candelaria v. People*, 148 P.3d 178, 180

29

(Colo. 2006) (citation omitted). Therefore, a defendant cannot receive multiple convictions for killing a single victim. *Id.* at 180-81. A division of this court has reached a similar conclusion regarding attempted first degree murder. *People v. Jackson*, 2018 COA 79, ¶¶ 79, 81 ("[T]wo convictions for attempted first degree murder based upon the same evidence and the same victim cannot stand."), *aff'd*, 2020 CO 75. We remand to the district court to correct the mittimus to reflect only one conviction and sentence for the above-listed victims. *Whiteaker*, ¶ 24. Specifically, we instruct the court to merge:

- Counts 1 and 2;
- Counts 4 and 10;
- Counts 5 and 20;
- Counts 6 and 21;
- Counts 8 and 16; and
- Counts 9 and 25.

## IX. Disposition

¶ 57    The judgment of conviction is affirmed in part, vacated as to the conviction for count 31, and reversed and remanded to the district court, in part, with instructions to correct the mittimus and

merge the judgments of convictions and sentences as set forth above.

JUDGE JOHNSON and JUDGE SCHOCK concur.